(806 P.2d 485)

No. 64,347

LETA MAE BARRETT, *Plaintiff/Appellant*, v. NINNESCAH BOW HUNTERS ASSOCIATION and the BOARD OF COUNTY COMMISSIONERS OF SEDGWICK COUNTY, KANSAS, *Defendants/Appellees*, v. RUSSEL N. BARRETT, *Third-Party Defendant/Appellant*.

Petition for review denied April 23, 1991.

Opinion filed February 22, 1991.

*John B. Barrett*, of Wichita, for the appellants.

*Russell E. Grant*, of Mulvane, for the appellee Ninnescah Bow Hunters Association.

*Carmen S. Greenup*, assistant county counselor, for the appellee Board of County Commissioners of Sedgwick County.

Before BRISCOE, C.J., DAVIS, J., and RICHARD B. WALKER, District Judge, assigned.

BRISCOE, C.J.: Leta Mae Barrett and Russel Barrett (Barretts) appeal from an order quieting title to disputed property in Ninnescah Bow Hunters Association (Bow Hunters) and from a finding that a roadway easement exists in favor of the Board of County Commissioners of Sedgwick County.

Bow Hunters' property is north of and adjacent to the Barretts' property. The acreage in dispute lies between a fence line and a line of elm trees north of the fence line. The Barretts contend their property extends to the tree line; Bow Hunters contends the fence line marks the northern boundary of the Barretts' property. The roadway in dispute abuts the eastern boundary of the Barretts' property and provides access to Bow Hunters' property.

I. Roadway easement.

The Barretts contend the court erred in finding an existing easement because the County did not order the trustees of the affected townships to open the road for public travel in 1875. The Barretts further argue that, since the road was not opened, the nonuser statute of 1879 applies and any purported dedication of the roadway was vacated as a matter of law.

In 1872, the legislature passed an act declaring all section lines in a variety of counties, including Sedgwick, public highways. L. 1872, ch. 181, § 1. In 1874, the legislature enacted the procedures necessary for establishing county roads. L. 1874, ch. 108. These procedures included the appointment of road viewers and the preparation and presentation of their report to the county commissioners:

"And the viewers shall make and sign a report in writing, stating their opinion in favor of or against the establishment, alteration or vacation of said road, or any part thereof, and set forth the reason of the same; which report shall be delivered to the county clerk by one of the viewers on or before the first day of the session of the county commissioners then next ensuing, and it shall be the duty of the commissioners, on receiving the report aforesaid, to cause the same to be read before their meeting; and if said report is favorable, and no legal objections appear against said report, and they are satisfied that such road will be of public utility, they shall order said road, survey and plat to be recorded, and from thenceforth said road shall be considered a public highway, and the commissioners shall issue their order to the trustees of the respective townships in which such road is located, directing them to cause the same to be opened for the public travel." L. 1874, ch. 108, § 6.

In 1879, the legislature passed an act for the vacation of unopened roads, commonly referred to as the "nonuser" statute (L. 1879, ch. 150, § 1):

"That any county road or part thereof, which has heretofore or may hereafter be authorized, which shall remain unopened for public use for the space of seven years at any one time after the order made or the authority granted for opening the same, shall be and the same is hereby vacated, and the authority granted for erecting the same is barred by lapse of time."

In 1875, pursuant to the 1874 act, the Sedgwick County Commissioners appointed road viewers. The road viewers prepared a report recommending to the county commissioners the establishment of "Central Road." (Central Road is the section line bordering the Barretts' property on the east and is the roadway at issue.) This report was received by the county commissioners, who then ordered the report "placed upon record." In 1877, the first private person in the chain of title to the Barretts' property received a patent from the United States Government.

In Kansas, a private party cannot obtain title to a public highway by adverse possession. *Eble v. State*, 77 Kan. 179, 184, 93 Pac. 803 (1908). A private person takes a patent to public land subject to any existing easements in favor of the public. *Tholl v. Koles*, 65 Kan. 802, 805, 70 Pac. 881 (1902). The nonuser statute applies only to roads authorized but otherwise never opened or used. *Kiehl v. Jamison*, 79 Kan. 788, 791, 101 Pac. 632 (1909). Subsequent nonuse of an opened road is not destructive of the

public right. *Gehlenberg v. Saline County,* 100 Kan. 487, 495, 165 Pac. 286 (1917).

In the present case, the patent on the property was first issued after the legislature declared the section line a public highway and after the road viewers' report was "placed upon the record" by the county commissioners. Therefore, if the acts of the county commissioners were sufficient to open the road, the patent was received subject to the roadway easement and any use or nonuse of the road by the public after that date is irrelevant.

The Barretts argue the commissioners' actions in 1875 did not fully satisfy the statutory requirements for opening a road. Specifically, they argue the commissioners failed to order the trustees of the affected townships to open the road for public travel as required by law: "[T]he commissioners shall issue their order to the trustees of the respective townships in which such road is located, directing them to cause the same to be opened for the public travel." L. 1874, ch. 108, § 6. They concede the County approved the road viewers' report and placed the order on the record, but argue the present-day county commissioners' failure to prove their predecessors ordered the township trustees to open the road renders the purported opening void and application of the nonuser statute results in the vacation of Central Road as a matter of law. We disagree.

Once the report of the road viewers is recorded, the road is established and the burden is on the complaining party to establish the invalidity of the actions taken. See *Gehlenberg,* 100 Kan. at 491. In Kansas, substantial compliance with the statute relating to roads and highways is sufficient to open a road:

" 'In determining the sufficiency of the records of inferior tribunals and public boards, to express their purposes or to preserve a memorial of their transactions respecting matters within their jurisdiction, technical precision should not be required; on the contrary, they should be liberally construed. They are not usually drawn by persons possessed of professional knowledge or skill in such matters; the law does not contemplate that such tribunals or boards shall be constantly attended by persons having such knowledge or skill, but rather, that their duties will be performed, at least generally, without such assistance. To subject them to the test of technical precision would, in most instances at least, defeat the object sought to be attained by the legislature in creating inferior tribunals and public boards; and therefore, however informal their records may be, if enough appears to show

with reasonable certainty that the requirements of the law have been substantially complied with, their proceedings should, upon grounds of public policy, if for no other reason, be sustained.' [Citation omitted.]" *Gehlenberg*, 100 Kan. at 490-91.

As further stated in *Gehlenberg*:

"But files in the county clerk's office, and particularly files a third of a century or half a century old, may be misplaced or lost or destroyed. The rule is that absence of documents from the files is not conclusive evidence that they were never filed. [Citation omitted.] Section 6 anticipated the rule, and when the viewers' report, the survey and the plat have been recorded, everything essential to legal establishment of the road shall be considered as having been done." 100 Kan. at 493.

It is conceded by the Barretts that the recording of a survey and plat were not required in this instance because the road was to be located upon or along a section line. L. 1874, ch. 108, § 3. Finally, "a road can not be regarded as unopened or unused where the country through which it lies was open and unobstructed at the time it was authorized and established." *Kiehl*, 79 Kan. at 791.

Here, the Barretts had the burden of proving the County did not order the township trustees to open Central Road. This they failed to do. The County substantially complied with the statute when it approved the road viewers' report and ordered it "placed upon record." The land that Central Road traversed was open prairie when the road was authorized and established. Thus, evidence of any use or nonuse after Central Road was established is irrelevant. Central Road was validly opened in 1875 and, to vacate it now, the Barretts must follow the procedures for vacating a road. *Eble*, 77 Kan. at 183. This they have not done.

The Barretts raise several evidentiary issues concerning the use or nonuse of the road: (1) whether the court erred in refusing to admit an 1882 atlas; (2) whether the court erred in admitting Rosalie Watts' affidavit: and (3) whether the court erred in allowing Keith Harrington's testimony. By its very terms, the nonuser statute applies only to roads authorized but otherwise unopened for a seven-year period after authorization. L. 1879, ch. 150. In the present case, Central Road was authorized in 1872 when the legislature declared all section lines in Sedgwick County public highways. L. 1872, ch. 181. Central Road was

opened in 1875 when the county cómmissioners approved the road viewers' recommendation and placed the road viewers' report on the record. The nonuser statute has no application under these circumstances and subsequent nonuse of any section of Central Road is not determinative of the issue at hand. *Gehlenberg,* 100 Kan. at 495. Therefore, we need not address the three enumerated evidentiary issues.

II. Disputed acreage.

The Barretts next contend the district court erred in finding Meyer obtained title to the disputed acreage by adverse possession. The Barretts' claim is multi-faceted: (1) The uncontroverted evidence establishes Meyer did not have exclusive possession of the strip after 1963; (2) Bow Hunters cannot be given equitable title when legal title was conveyed pursuant to the quitclaim deeds from Meyer's residuary legatees; and, finally, (3) Rogers only received the north 10 acres in Meyer's will and, thus, any attempt to give her successors more acreage is an impermissible collateral attack on the probate proceedings. Bow Hunters argues the evidence proved Meyer adversely possessed the property for more than 15 years and, as this is a question of fact, the decision must be affirmed if there is substantial competent evidence to support it. *Schaake v. McGrew, et al.,* 211 Kan. 842, 845, 508 P.2d 930 (1973). Bow Hunters also argues Meyer intended to give Rogers all the property he owned and the misdescription of the property in Meyer's will does not defeat its claim.

The district court found the fence line separating the two properties, by reputation in the community, constituted the boundary line for over 15 years. The Barretts were aware of the fence line and knew Meyer possessed all the land north of the fence; thus, Meyer obtained title to the strip by adverse possession. The court also found the Barretts could not defeat Bow Hunters' superior claim by virtue of quitclaim deeds.

K.S.A. 60-503 provides: "No action shall be maintained against any person for the recovery of real property who has been in open, exclusive and continuous possession of such real property, either under a claim knowingly adverse or under a belief of ownership, for a period of fifteen (15) years." Whether title is acquired by adverse possession is a question of fact to be determined by the trier of fact. See *Stith v. Williams,* 227 Kan. 32,

36, 605 P.2d 86 (1980). The standard of review therefore is whether there is substantial competent evidence to support the trial court's findings. *Schaake v. McGrew, et al.*, 211 Kan. 842, 845, 508 P.2d 930 (1973). Further, the reviewing court does not reweigh the evidence or judge the credibility of witnesses. See *Boese v. Crane*, 182 Kan. 777, 779, 324 P.2d 188 (1958).

In the present case, there is no question Meyer possessed the land north of the fence line from 1953 until his death in 1980. For purposes of 60-503, Meyer's successors in interest need only establish Meyer's adverse possession for a period of 15 years or until 1968. For 27 years, Meyer's possession of the land north of the fence line was open and continuous and was based on a belief of ownership. The only question is whether the evidence supports a finding of "exclusive" use for the 15-year period from 1953 to 1968.

The Barretts purchased the south 70 acres in 1963 and began farming the land in 1976. Prior to 1976, the only use they made of the land north of the fence line was an occasional weiner roast and picnic with the Campfire Girls. The rest of the various uses listed by the Barretts did not begin until 1971. Is such incidental use sufficient to conclude Meyer did not exclusively possess the land?

For 27 years, Meyer used the property as a vacation "get away" on a regular basis. He maintained a cabin, a pole barn, and a windmill on the property and kept horses there for quite awhile. Meyer also leased the land to a neighbor for cattle grazing. The Barretts knew of the fence line in 1963 and knew Meyer had been in possession of the land north of the fence since 1953. Yet they did not dispute the location of the true boundary until after Meyer's death in 1980. The trial court found most, if not all, of the Barretts' activities north of the fence occurred after 1976 and did not act to dispossess Meyer or his successors. The record supports this finding.

Having concluded that Meyer's adverse possession of the disputed strip was established, we also must address whether his subsequent devise of the property limited the interest of his successors. If the successors' rights are so limited, the quitclaim deeds obtained by the Barretts from the residuary legatees would effect transfer of the strip to the Barretts.

Meyer's will gave to his friend Ida Rogers land described as the "North 10 acres of the East half of the Southwest quarter, Section 25, Township 29, Range 3 West, Sedgwick County, Kansas." The probate court made a correction in the journal entry of final settlement of Meyer's estate when it distributed to Rogers the "North 10 acres of the East half of the *Southeast* quarter." (Emphasis added.) Barrett argues this devise gave Rogers only the north 10 acres and any remaining acreage fell to the residuary legatees. Bow Hunters argues the district court implicitly found Meyer intended that Rogers receive all of the acreage and misdescription of the property does not adversely affect its claim.

K.S.A. 59-614 provides: "Every devise of real estate shall pass all the estate of the testator therein, unless it clearly appears by the will that he or she intended a less estate to pass." Here, Meyer did not express an intent to convey less than his entire interest in the acreage and it cannot be said the intent to convey a lesser interest is necessarily implied from the terms of the devise. See *Zabel v. Stewart*, 153 Kan. 272, 279, 109 P.2d 177 (1941).

Additionally, where there is a latent ambiguity in the description of the land conveyed, parol evidence may be admitted to explain the ambiguity. *Hoover v. Roberts*, 146 Kan. 785, 792, 74 P.2d 152 (1937). Here, Meyer owned all of the land north of the fence line. Both he and the prior owner, Thomas Jaycox, obviously assumed that Jaycox owned an 80-acre tract of land out of which Meyer purchased 10 acres. The attorney who probated Meyer's estate testified that Meyer intended to give the acreage to Rogers and did not intend to pass a strip to the residuary legatees. The attorney for Meyer's widow testified that Meyer intended that Rogers receive all of the acreage. Rogers testified that Meyer told her on more than one occasion that "the farm" would be hers and indicated "the farm" encompassed all of the land north of the fence line. There was no evidence that Meyer intended anything other than passing all of the acreage to Rogers. The acreage referred to in Meyer's will was merely a descriptive name and not the exact quantity that Meyer intended to convey to Rogers. See *Mayberry v. Beck*, 71 Kan. 609, 612, 81 Pac. 191 (1905).

It is clear that Meyer obtained title to the acreage between the fence line and the line of elm trees by adverse possession. Rogers inherited the acreage upon Meyer's death and Bow Hunters, as successor in interest, has title to the disputed strip north of the fence.

Affirmed.