(90 P.3d 365)

No. 91,301

In the Matter of the Marriage of TANYA KATRINA WILLIAMS, n/k/a TANYA KATRINA WIMER, *Appellant,* and PATRICK KENNETH WILLIAMS, *Appellee.*

Opinion filed May 28, 2004.

*Terry J. Malone,* of Williams, Strobel, Malone, Mason & Ralph, P.A., of Dodge City, for appellant.

*Jae M. Lee* and *Curtis E. Campbell,* of Curtis E. Campbell, Chartered, of Cimarron, for appellee.

Before JOHNSON, P.J., GREEN, J., and ROBERT J. FLEMING, District Judge, assigned.

JOHNSON, J.: Tanya Katrina Williams, now known as Katrina Wimer, appeals the district court's order changing the residential custody of her son, Dalton. Following the order, Dalton's residential custody was placed with his father, Patrick Kenneth Williams, while residential custody of Dalton's full sister, Ashley, remained with Katrina. On appeal, Katrina contends that the separation of siblings effected by the district court's order violated the legislative mandate in K.S.A. 2003 Supp. 60-1610(a)(5)(B), which permits divided custody only in "exceptional cases." Finding that the district court was presented with an exceptional case, we affirm.

Following their 1996 divorce, Katrina and Patrick had joint custody of Ashley (d.o.b. 06/30/89) and Dalton (d.o.b. 08/01/94), with Katrina as the primary residential custodian. In February 1997, Katrina and the children moved to Oklahoma. Later, she married Troy Wimer, and they have a son, Robert. Patrick remained in Kansas, married Lori, and had a son, Wyatt. Lori also has a son, Tyson, from a prior relationship.

During spring break visitation in March 2003, Patrick took Dalton to see Steven A. Cagle, LSCSW, with Family Practice Associates in Dodge City, to address some concerns Patrick had with Dalton's behavior and to assess the sincerity of Dalton's expressed desire to live with his father. Cagle had three sessions with Dalton prior to the conclusion of spring break visitation. In these sessions, Cagle observed that Dalton appeared lethargic and unhappy; Dalton said he did not have a close relationship with his older sister and younger half-brother and insisted that he wanted to live with his father. In the last session, Cagle specifically questioned Dalton about a fire he attempted to set next to his mother's residence. Dalton said his motive in setting the fire was that he did not want to live at his mother's house anymore. Cagle was concerned that Dalton appeared to lack remorse; Cagle characterized Dalton's actions as a "cry for help."

In April 2003, Patrick filed a motion to change Dalton's residential custody from Katrina to himself. Acknowledging that Ashley was apparently doing well in her mother's custody, Patrick did not ask to change his daughter's residential custody. In his motion, Patrick alleged, *inter alia*, that Dalton was exhibiting signs of behavioral and emotional problems; that Dalton had attempted to set fire to Katrina's house and Katrina had not dealt with the situation appropriately; that Dalton had expressed a strong desire to live with his father; and that Patrick was better suited to meet Dalton's current needs.

During the pendency of the custody motion, Patrick asked the court to define his summer visitation because Katrina had allegedly said she intended to deny Patrick any summer parenting time. Based on the parties' agreement, the court ordered that Ashley and

Dalton would visit Patrick from May 24 to June 8, and from June 21 to July 26, 2003.

In May 2003, Katrina moved to transfer the case to Oklahoma pursuant to the Uniform Child-Custody Jurisdiction and Enforcement Act, K.S.A. 38-1336 *et seq.* The Oklahoma court declined to exercise jurisdiction until the Kansas court relinquished jurisdiction. Finding the Kansas situs to be more convenient, the Kansas court retained jurisdiction.

On July 28, 2003, Cheryl Legg of Southeastern Psychiatric Services in McAlester, Oklahoma, met with Katrina and Dalton for an hour. On July 30, Ms. Legg met with just Dalton for an hour and, later in the day, met with Dalton and Ashley. On July 31, Ms. Legg had a family therapy session with Wimer, Katrina, Ashley, and Dalton. Ms. Legg testified that the intensive counseling sessions over a 3-day period were necessary to prepare for the upcoming court hearing. Ms. Legg also characterized Dalton's fire-setting as a cry for help, although she opined that the relief he sought was from being placed in the middle of a tug-of-war between his mother and father. Ms. Legg opined that Dalton and Ashley had a strong bond and that they should not be separated.

On August 6, 2003, the court held an evidentiary hearing on the custody motion. Testimony was taken from the two therapists, Cagle and Legg, as well as from Patrick, his wife Lori, and Katrina. The parties stipulated to the proffered testimony of Katrina's husband, Troy. At the conclusion of the hearing, the district court announced from the bench that it was granting the motion to change Dalton's residential custody to Patrick.

In making its decision, the district court acknowledged that both parents love their children and that there is a presumption requiring the court to keep siblings together unless there is an exceptional case. The court noted that it was considering the history of the case, including Katrina's lack of cooperation. The court expressed some frustration with Katrina's attempt to transfer jurisdiction to Oklahoma after the commencement of the custody litigation. The court indicated a belief that Katrina obtained the 11th hour intensive counseling with Ms. Legg to assist in resisting a custody

change, rather than to timely address Dalton's problems. Further, the district court specifically found:

"8. That the truth is that there has been friction in the relationship between Dalton and Ashley, even though they love one another.

"9. That there has been an expressed preference by Dalton, in a neutral setting, when there was not a motion pending, that he stay with his father, and there were rational reasons.

"10. That those rational reasons were:

a. That he viewed his mother's parenting role as geared toward his older sister.

b. That he was discriminated against in a way that caused him to be considered less in the family relationship than his sister was.

c. That he had a preference to stay with his father, who apparently had the ability to show attention when necessary, and also participate in activities that Dalton apparently identified with and benefited from.

"11. That the physical structures of the homes favor the Respondent's arrangement and the space available for Dalton is more favorable opposed to Petitioner's home.

"12. That the motivation to maintain a long term view of the parenting roles for both parents would be promoted by allowing Dalton to live with his father.

"13. That there is no persuasive evidence that the sibling relationship will be damaged.

"14. That there has been a lack of communication between the parties that can be improved, if the children are living in each home.

"15. That there is evidence that is persuasive that there has been a tug-of-war existing and that Dalton feels he is in the middle of it, and that it exists because there is a conflict regarding where he's going to reside. It can be resolved by changing his residence.

"16. That it would be in Dalton's best interests if he were to reside with his father.

"17. That all of the facts together, from the beginning of this case, do constitute a material change of circumstances to make that change of custody for Dalton."

The court made additional findings that are not germane to this opinion. In response to a motion to alter or amend, the district court acknowledged that it had not specified the findings which made this an exceptional case. It then found that, pursuant to 60-1610(a)(5)(B), this is an exceptional case justifying a divided custody order based generally on the totality of the circumstances and specifically on Dalton's stated preference to live with his father and Dalton's stated reasons for that preference.

Katrina states the question on appeal to be: "Were sufficient facts established for the district court to find that an exceptional case existed, as a matter of law, to justify the order to divide custody of a brother and sister between the parents?" Appellant's brief begins by challenging a few of the district court's findings as being either unsupported by the evidence or controverted by other evidence. Then, the argument transforms into a discussion of why Katrina believes the parties' difficulties are "ordinary, common and frequent" for similarly situated split families and why Katrina believes the legislature restricted divided custody to protect the bond between siblings. The conclusion she reached is that this case presents no exceptional circumstances which would justify divided custody, as a matter of law.

We perceive appellant's blended argument can be better analyzed by separating it into two questions: (1) whether the district court's findings were supported by substantial competent evidence; and (2) whether the district court's findings were sufficient to support the legal conclusion that this is an exceptional case. Ordinarily, appellate review of a district court custody order is for an abuse of discretion. See *In re Marriage of Whipp*, 265 Kan. 500, 502, 962 P.2d 1058 (1998). Here, however, we are called upon to interpret and apply K.S.A. 2003 Supp. 60-1610(a)(5)(B), making the following standard more appropriate:

"Where the trial court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. [Citation omitted.]" *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 747, 27 P.3d 1 (2001).

## SUBSTANTIAL COMPETENT EVIDENCE

The judge hearing the custody motion had previously presided over the parties' disputes. Therefore, we should afford the judge due deference in his consideration of the history of the case and in his characterization of the parties' motives.

Katrina stipulated to the qualification of Steven Cagle as an expert. Cagle testified that Dalton sincerely wanted to live with his

father. He further described Dalton's reasons for wanting to move from his mother's residence, which included problems in the relationship between Dalton and Ashley. Granted, Katrina's expert, Cheryl Legg, provided conflicting testimony on these points. However, we do not function as a trier of fact and must defer to the district court's determination of which testimony is more persuasive. If we refrain from reweighing the evidence and assessing witness credibility, then we must uphold the factual findings that deal with Dalton's living arrangement preference and with Dalton's relationship with his sister.

The district court's finding that Katrina engaged the services of a therapist to prepare for court, rather than to timely deal with Dalton's needs is supported by evidence. The attempted fire-setting incident occurred prior to Dalton's March visitation with his father. Katrina did not effect Dalton's first intake with Cheryl Legg until July 28, some 9 days prior to the custody hearing, and after a mediator had suggested she obtain counseling for Dalton. Even Ms. Legg characterized the fire-setting act as a cry for help. Further, Ms. Legg opined that Dalton was suffering from adjustment disorder and that he displayed symptoms of depression. She said that she personally handled the case because the Katrina family unit would require intensive counseling. However, she admitted the primary reason for conducting four sessions in 3 days was to prepare for the upcoming court case, and she intimated that Katrina should have sought out her services earlier. From the evidence, one could reasonably infer that Katrina ignored clear signs that Dalton was a disturbed child until she was motivated to obtain evidence for the custody hearing.

The evidence that Dalton would have his own room at Patrick's house, as opposed to sharing a room at Katrina's house, was uncontroverted and supported the court's finding. The evidence supported that Patrick was more attuned and attentive to Dalton's interests, as opposed to Katrina's efforts to get Dalton involved with Ashley's projects.

However, the findings which suggest that separating Dalton and Ashley would result in better communication and cooperation between the parents do not appear to have any factual support in the

record. Neither therapist proffered that opinion and, therefore, the judge's findings in that regard should be disregarded.

In summary, the evidence was sufficient to support the district court's findings that Dalton wanted to live with his father; that Dalton perceived his mother gave preferential treatment to Ashley; that the relationship between Dalton and Ashley was strained; that Dalton was conflicted by the custody fight; that Katrina had failed to timely recognize and address Dalton's manifestations of emotional or behavioral problems; that Patrick's residence would provide Dalton a room of his own; and that Patrick would better accommodate Dalton's interests. However, all those findings are penultimate. The primary criterion in a custody determination is the best interests of the child. See *LaGrone v. LaGrone*, 238 Kan. 630, 632-33, 713 P.2d 474 (1986). The district court's collateral findings were supported by the evidence, and those findings supported the determination that divided custody was in the best interests of Dalton.

*EXCEPTIONAL CASE*

K.S.A. 2003 Supp. 60-1610(a)(5) provides the types of residential arrangements a court may consider in a divorce case, listed in order of preference. Subsection (B) provides: "In an exceptional case, the court may order a residential arrangement in which one or more children reside with each parent and have parenting time with the other." K.S.A. 2003 Supp. 60-1610(a)(5)(B). Thus, arguably, the district court does not have the discretion to divide the custody of children of the same parents where there are no exceptional circumstances. See *LaGrone*, 238 Kan. at 635 (Lockett, J., concurring in part, dissenting in part). Interestingly, neither party mentions the fact that under any arrangement, both Dalton and Ashley will, by necessity, be separated from a half-brother.

Our next step, then, is to determine whether the findings which are supported by substantial competent evidence are sufficient to conclude that the district court was presented with an "exceptional case." *LaGrone* is the only case on divided custody cited by either party.

The *LaGrone* majority opinion states the obvious: "The statute does not define what an exceptional case is, nor does it give examples." 238 Kan. at 633. However, the opinion does not attempt to provide a definition, but rather simply states that "[t]he facts before the trial court in this case were unusual." 238 Kan. at 633. Apparently, the unusual character of that situation was that the father had, at times, been the primary caretaker of the child placed in his custody. The dissent noted the testimony that "the two children loved each other, played together and got along well," and that both parents were fit, both loved their children, and both took good care of them. 238 Kan. at 634-35. The dissent could not find any exceptional circumstances, rejected the majority's reliance on perpetuating the status quo, and lectured that "[f]amily ties between children of the same parents should not be treated lightly." 238 Kan. at 635.

No reasonable person can seriously doubt the wisdom of Justice Lockett's admonition regarding sibling relationships. See *Henderson v. Henderson*, 537 So. 2d 125, 128 (Fla. Dist. App. 1988) (family unit should not be further fractured by a divorce). Children should not be deprived of a sibling relationship simply to accommodate the wants and needs of their separated parents. However, when the children's own welfare is implicated, the nonseparation rule is subordinate to the best interests of the child rule. Otherwise, we might well be employing a rule developed for the benefit of the children of divorcing parents to actually defeat that which would be beneficial to the child.

Perhaps it is best that neither statutory law nor case precedent provides a definition for "exceptional case." The determination is too important to be subjected to a mechanical application of an artificial litmus test containing three factors or two prongs. However, we feel comfortable definitively stating that, when the district court makes a finding, supported by substantial competent evidence, that divided custody is in a child's best interests, the court has met the requirement of establishing an "exceptional case."

Here, the district court found divided custody to be in Dalton's best interests. That finding was supported by substantial competent evidence. As a matter of law, this was an exceptional case.

Affirmed.

GREEN, J.: I dissent for the following reasons.

The question presented is to what extent did the Kansas Legislature grant to the trial court the authority to divide the residency of Dalton and Ashley. K.S.A. 2003 Supp. 60-1610(a)(5)(B) sets up a legal condition precedent that exceptional circumstances must exist before the trial court may divide the residency of siblings. As a result, the issue is whether the evidence established that this was "an exceptional case." Both the trial court and the majority answered yes. I disagree and would reverse the trial court's judgment dividing the custody of Dalton and Ashley.

*Exceptional Case Requirement*

K.S.A. 2003 Supp. 60-1610(a)(5)(B) states: "In an *exceptional case*, the court may order a residential arrangement in which one or more children reside with each parent and have parenting time with the other." (Emphasis added). Appellate courts review the record to determine whether a trial court's findings in a case were supported by substantial competent evidence and whether the findings were sufficient to support the trial court's conclusions of law. Appellate review of a trial court's conclusions of law is unlimited. *Lindsey v. Miami County National Bank*, 267 Kan. 685, 689-90, 984 P.2d 719 (1999).

As I have previously stated, this appeal hinges on whether the evidence established that this was "an exceptional case" under K.S.A. 2003 Supp. 60-1610(a)(5)(B). Both parties cite the case of *LaGrone v. LaGrone*, 238 Kan. 630, 713 P.2d 474 (1986). In *LaGrone*, the trial court, under an earlier statute, divided the custody of two sisters. Our Supreme Court affirmed the trial court's decision. In reaching this determination, our Supreme Court noted that a trial court is required to consider all relevant factors under K.S.A. 60-1610(a)(3)(B) in determining custody issues. Our Supreme Court stated that one factor to be considered is which parent has had the actual care and custody of the child during the child's lifetime. 238 Kan. at 633. Significantly, in this case, Katrina has had the residential care and custody of Dalton since the parties were divorced in 1996.

In dissenting from the majority's decision in *LaGrone*, Justice Lockett maintained that there were no exceptional circumstances that required the custody division. Justice Lockett stated:

"Where there are no exceptional circumstances, the children of divorced or unwed parents, especially those children of tender years should not be separated by awarding custody of one child to the mother and custody of the other child to the father. Family ties between children of the same parents should not be treated lightly." 238 Kan. at 635.

It is well-established that in a child custody case there is a presumption that siblings should remain together. In recognizing that siblings should not be separated except for the most compelling case, the Florida court in *Henderson v. Henderson*, 537 So. 2d 125, 128 (Fla. Dist. App. 1988), stated: "Whenever possible the family unit should not be further fractured as a consequence of a marriage being dissolved." Similarly, the South Dakota Supreme Court stated in *Mayer v. Mayer*, 397 N.W.2d 638, 644 (S.D. 1986): "Justice requires that society exercise its moral duty to insure that children in a family enjoy the right to remain together, to share each other's lives, and to grow up together, until such time as necessity and the welfare of the children, itself, requires their separation. [Citation omitted.]." By including the phrase "exceptional case" in K.S.A. 2003 Supp. 60-1610(a)(5)(B), the legislature clearly intended to significantly restrict the separation of siblings.

The words of a statute are the main source for determining a legislative purpose. Webster's New Collegiate Dictionary 398 (1976) defines "exceptional" as "forming an exception: rare." "[I]n construing statutes, statutory words are presumed to have been and should be treated as consciously chosen with an understanding of their ordinary and common meaning and with the legislature having meant what it said. [Citation omitted.]" *International Ass'n of Firefighters v. City of Kansas City*, 264 Kan. 17, 31, 954 P.2d 1079 (1998). K.S.A. 2003 Supp. 60-1610(a)(5)(B) was enacted to prevent the separation of siblings except for the most compelling reasons.

Nevertheless, the majority states that "when the children's own welfare is implicated, the nonseparation rule is subordinate to the best interests of the child rule." The majority's approach would have the effect of turning a divided siblings' case into an ordinary

child custody case. Moreover, the majority's approach would eliminate the legislature's legal condition precedent under K.S.A. 2003 Supp. 60-1610(a)(5)(B): the requirement that exceptional circumstances must exist before the trial court may divide the residency of siblings. No part of a statute is to be treated as irrelevant.

As a general rule, statutes are construed to avoid unreasonable results. There is a presumption that the legislature does not intend to enact useless or meaningless legislation. *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 635, 643, 941 P.2d 1321 (1997). The majority's construction of K.S.A. 2003 Supp. 60-1610(a)(5)(B) would render meaningless the Kansas Legislature's requirement that "an exceptional case" must exist before siblings may be divided.

Nevertheless, assuming arguendo that the majority's "best interest of the child rule" may be invoked to determine when "an exceptional case" exists, the trial court misapplied the majority's test. Here, in concluding that this was "an exceptional case," the trial court ignored counterevidence that it was not in Dalton's best interests to be separated from his sister. K.S.A. 2003 Supp. 60-1610(a)(3)(B) requires the trial court to consider the factors listed under that statute when determining child custody, residency of the child, and parenting time. The trial court's findings omitted evidence pertaining to two objective factors: (1) Dalton's adjustment to his home and (2) spousal abuse between Patrick and Lori. See K.S.A. 2003 Supp. 60-1610(a)(3)(B)(v) and (vii).

Normally, a litigant must object to inadequate findings of fact and conclusions of law at the trial court level in order to preserve the issue for appeal. See *Gilkey v. State*, 31 Kan. App. 2d 77, 77-78, 60 P.3d 351, *rev. denied* 275 Kan. 963 (2003). In this case, Katrina objected to the trial court's failure to describe the findings of fact that made this matter "an exceptional case."

Furthermore, K.S.A. 2003 Supp. 60-252(b) states:

"When findings of fact are made in actions tried by the court without a jury, the question of the sufficiency of the evidence to support the findings may thereafter be raised whether or not the party raising the question has made in the district court an objection to such findings or has made a motion to amend them or a motion for judgment."

Katrina's argument on appeal essentially relates to whether there was sufficient evidence for the trial court to find that this was "an exceptional case" under K.S.A. 2003 Supp. 60-1610(a)(5)(B). As a result, these omitted findings, even in the absence of an objection to the trial court's findings, may be considered. See also *In re Marriage of Bradley*, 258 Kan. 39, 50, 899 P.2d 471 (1995) (finding that in all actions under 60-252 and Supreme Court Rule 165 [2003 Kan. Ct. R. Annot. 202], it is unnecessary to object to the trial court's findings in order to question the sufficiency of the evidence on appeal).

Turning our attention to the omitted factors, the trial court failed to address evidence of Dalton's adjustment to his home, school, and community in Oklahoma as required by K.S.A. 2003 Supp. 60-1610(a)(3)(B)(v). Regarding this factor, the evidence showed that Dalton had lived with Katrina and Ashley in Oklahoma for the last 6 years, had just completed his third-grade year, had made significant improvements in reading, and had earned A and B grades. Dalton was involved in several extracurricular activities, including cub scouts, soccer, 4-H, and church activities. In addition, Katrina planned to enroll Dalton in football for the next school year, and she had recently acquired a lamb for Dalton to show in 4-H activities. Ashley was also involved in showing sheep for 4-H activities, and she and Dalton spent time together caring for their sheep. Therapist Cheryl Legg testified that Ashley and Dalton have a very strong bond and depend on each other emotionally.

In addition, the trial court failed to mention the spousal abuse that had occurred between Patrick and Lori. Spousal abuse is a factor required to be considered under K.S.A. 2003 Supp. 60-1610(a)(3)(B)(vii). Patrick and Lori became involved in a verbal dispute while Dalton and Ashley were visiting them, and a police officer was called to their house. Ashley and Dalton later told Legg that they had hard feelings about this fight. Dalton felt like he was in the middle of the fight. The trial court, however, did not explicitly consider the effect that this type of arguing between Patrick and Lori would have on Dalton once he began living with Patrick.

Clearly, this counterevidence would render the trial court's holding that this was "an exceptional case" questionable. Here, the trial

court omitted from its findings two important objective factors listed under K.S.A. 2003 Supp. 60-1610(a)(3)(B). Because the trial court failed to evaluate these two important factors along with its other findings, the trial court's findings were inadequate.

Consequently, even by applying the majority's "best interest of the child" test to determine when "an exceptional case" exists, the trial court's findings were insufficient to support the trial court's conclusion of law that this was "an exceptional case."

*Trial Court's Findings*

Turning our attention to the trial court's findings, the majority states that "[w]hen a district court makes a finding, supported by substantial competent evidence, that divided custody is in a child's best interests, the court has met the 'exceptional case' requirement of K.S.A. 2003 Supp. 60-1610(a)(5)(B)." In this case, the trial court concluded that all of the facts together made this "an exceptional case." The trial court made the following 23 findings in determining that Dalton should reside with his father:

"1. That the parties are the parents of the minor children, to-wit: Ashley M. Williams born June 30, 1989; and Dalton K. Williams born August 1, 1994.

"2. That the parties have joint custody of the two (2) minor children, and the Petitioner is now the residential custodian of both.

"3. That both parents love their children.

"4. That there is a presumption that the Court should keep siblings together, unless there is an exceptional case.

"5. That this Court considers the history of this case and it began with a lack of cooperation by the custodial parent and that it was exacerbated by her move to Oklahoma.

"6. That her response to a Motion for change of custody was to attempt to take jurisdiction from Kansas and place it in Oklahoma, so that it would be more difficult for the Respondent to participate in any litigation that may have occurred regarding visitation or custody.

"7. That the near desperate effort to obtain counseling and a professional opinion in support of her position indicates an effort to not directly address the problem as it arose, but rather to assist her effort in refuting the Motion to Change Custody.

"8. That the truth is that there has been friction in the relationship between Dalton and Ashley, even though they love one another.

"9. That there has been an expressed preference by Dalton, in a neutral setting, when there was not a motion pending, that he stay with his father, and there were rational reasons.

"10. That those rational reasons were:

a. That he viewed his mother's parenting role as geared toward his older sister.

b. That he was discriminated against in a way that caused him to be considered less in the family relationship than his sister was.

c. That he had a preference to stay with his father, who apparently had the ability to show attention when necessary, and also participate in activities that Dalton apparently identified with and benefitted from.

"11. That the physical structures of the homes favor the Respondent's arrangement and the space available for Dalton is more favorable opposed to Petitioner's home.

"12. That the motivation to maintain a long term view of the parenting roles for both parents would be promoted by allowing Dalton to live with his father.

"13. That there is no persuasive evidence that the sibling relationship will be damaged.

"14. That there has been a lack of communication between the parties that can be improved, if the children are living in each home.

"15. That there is evidence that is persuasive that there has been a tug-of-war existing and that Dalton feels he is in the middle of it, and that it exists because there is a conflict regarding where he's going to reside. It can be resolved by changing his residence.

"16. That it would be in Dalton's best interests if he were to reside with his father.

"17. That all of the facts together, from the beginning of the case, do constitute a material change of circumstances to make that change of custody for Dalton.

"18. That the parties shall all continue in counseling to address communication among yourselves, and encourage the children to express their thoughts and feelings with you, and with one another.

"19. That this custody arrangement will promote the additional benefit of parenting inputs of both parents.

"20. That the exchange of Dalton shall take place on August 16, 2003, in El Reno, Oklahoma.

"21. That visitation/parenting time should occur in a manner that will allow the children to be together on weekends and holidays.

"22. That the parties should attempt to prepare a visitation/parenting time schedule to accommodate the order, however, should they be unable, they shall submit themselves to mediation.

"23. That the parties shall exchange child support worksheets."

Katrina objected to these findings and asked the trial court to make or identify those findings which made the case exceptional. As a result, the trial court made this holding:

"2. That pursuant to K.S.A. 60-1610(a)(5)(B), this is an exceptional case which justifies a divided custody order."

In addition, the trial court made these findings:

"3. That generally all the facts together constitute an exceptional case.

"4. *That specifically, the preference expressed by Dalton Williams to reside with his father, and the reasons given therefor [w]as the primary factor in determining that this is an exceptional case."* (Emphasis added.)

The first two findings merely set forth Dalton's and Ashley's dates of birth and describe their custodial arrangement. From this information, we know that Ashley was 14 years old and Dalton was 9 years old at the time of the hearing. Although Patrick and Katrina had joint custody of the children, Katrina had been the residential custodian of both Dalton and Ashley since she and Patrick divorced in 1996.

In its third finding, the trial court acknowledged that both Katrina and Patrick love Dalton and Ashley. Finding 4 states the presumption "that the Court should keep siblings together, unless there is an exceptional case."

Finding 5 states "[t]hat this Court considers the history of this case and it began with a lack of cooperation by the custodial parent and that it was exacerbated by her move to Oklahoma." I was unable to find any evidence that Katrina was uncooperative in a manner that would have any bearing on the current custody determination. In fact, Katrina and Patrick were able to cooperate and work out a visitation schedule for summer 2003.

Although Katrina moved to Oklahoma during February 1997, this move occurred so that Katrina could be near her family and happened more than 6 years before the custody hearing. Katrina went to work for her family, remarried, and had another child in Oklahoma. Dalton and Ashley attend school in Oklahoma and are involved in numerous extracurricular activities. Under K.S.A. 2003 Supp. 60-1620(c), a move may be a material change of circumstances which allows the trial court to modify a prior custody order. In this case, however, the evidence indicates that Patrick did not object at the time of the move. By not objecting when the move occurred, Patrick acquiesced in Katrina's decision to establish a life

for Dalton and Ashley in Oklahoma. Consequently, this finding was not supported by the record.

Finding 6 states that Katrina's "response to a Motion for change of custody was to attempt to take jurisdiction from Kansas and place it in Oklahoma, so that it would be more difficult for the Respondent to participate in any litigation that may have occurred regarding visitation or custody." At the time Katrina filed this motion, Dalton and Ashley had been residing with her for over 6 years in Oklahoma. Dalton was involved in several extracurricular activities and was attending school in Oklahoma. Because Dalton had significant contacts with Oklahoma, it is apparent that Oklahoma would have been a more appropriate forum for the presentation of evidence relating to Dalton. See K.S.A. 38-1354. For that reason, Katrina's decision to move for the transfer of jurisdiction from Kansas to Oklahoma was reasonable and was irrelevant in determining whether this case was exceptional.

In finding 7, the trial court states "[t]hat the near desperate effort to obtain counseling and a professional opinion in support of her position indicates an effort to not directly address the problem as it arose, but rather to assist her effort in refuting the Motion to Change Custody." This finding does not articulate "the problem" that Katrina should have addressed. The majority seems to refer to the "attempted fire-setting incident" as the problem, stating that the "incident occurred prior to Dalton's March visitation with his father." Katrina testified that she learned about the fire incident 2 days after it had occurred. She discovered some matches, sticks shaped in the form of a teepee around a bandana, and a scorched area on the siding of the house. Katrina further testified that she and Troy punished Dalton by spanking him and taking away some of his privileges.

Katrina testified that she contacted the school counselor in March about talking with Dalton. When she found out that a counselor at school could not see him, there were only 2 weeks remaining before Dalton left for Patrick's house. Katrina and Patrick went to mediation in June, at which time the mediator recommended counseling for Dalton. Katrina testified that after talking with Patrick and the mediator, she felt that there probably were

some concerns as far as Dalton's emotional well-being. At that point, Katrina made an appointment with therapist Legg. Katrina testified that Dalton did not show any signs of being depressed at her home and was a happy child who played with his friends.

Dalton was at Patrick's house from May 24, 2003, to June 8, 2003, and from June 21, 2003, to July 26, 2003. Two days after Dalton returned to Katrina's house in July, Katrina took him to see Legg. As a result, the evidence does not support the trial court's finding that Katrina made a "near desperate effort" to obtain counseling and did not address the "problem" as it arose.

In finding 8, the trial court acknowledged that Dalton and Ashley love one another but stated that there had been friction in their relationship. Ashley had commented that Dalton was hateful and rude and that her friends could not stand him. In addition, Patrick indicated that Ashley tried to parent Dalton. There was also evidence that Dalton was jealous of Ashley. From this evidence, I am unable to conclude that Ashley and Dalton were engaged in anything other than sibling rivalry that is a normal part of learning how to get along with others.

Finding 9 states "[t]hat there has been an expressed preference by Dalton, in a neutral setting, when there was not a motion pending, that he stay with his father, and there were rational reasons." The trial court found that Dalton's expressed preference to live with his father and the reasons given therefor was the primary factor in determining this was "an exceptional case."

Dalton told therapist Steve Cagle and Patrick on several occasions that he wanted to live with Patrick. When Dalton visited with Cagle at the start of the summer, however, Dalton said: " 'I don't know if I want to live with my Dad as bad as what I said I did, but I still want him to go ahead and go to Court.' " In addition, Katrina testified that when she picked up Dalton from his visit with Patrick in March, Dalton stated: " 'I might want to live with my dad, I don't know for sure.' " By the time they got home, however, Dalton said: " 'Mom, I don't want to live with Dad.' " When Legg spoke with Dalton at the end of the summer, Dalton said that he wanted to live with Ashley. Dalton told Legg that he was afraid to really talk to Cagle because of the information going back to Patrick. Legg

testified that Dalton felt like he was torn between his parents and wanted to please both his mother and his father. Dalton's statements to Patrick, Cagle, Legg, and Katrina indicate that he changed his preference about where he wanted to live depending on the person to whom he was talking.

Under finding 10, the rational reasons for Dalton's expressed preference to live with his father were: (1) that he viewed Katrina's parenting role as geared toward his older sister; (2) that he was discriminated against in a way that caused him to be considered less in the family relationship than his sister was; (3) that his father had the ability to show attention when necessary and also participate in activities that Dalton apparently identified with and benefitted from. The first two reasons for Dalton's expressed preference for living with his father seem to be the type of normal feelings and conflicts that occur in most family relationships. Dalton told Cagle that he felt like his mom preferred Ashley over him and that he was bored and unhappy. Katrina testified that they spent a lot of time helping Ashley with her sheep. Nevertheless, Katrina and Troy made efforts to involve Dalton in several activities, including family activities with Ashley.

Turning my attention to the third reason, Patrick testified that Dalton would be able to play football at his school in Kansas and participate in other activities. In addition, Patrick had a flexible work schedule. Katrina, however, worked for her parents and was able to take care of the children after school. Dalton would also be able to play football the next school year in Oklahoma and was already involved in several other activities.

In finding 11, the trial court determined "[t]hat the physical structures of the homes favor the Respondent's arrangement and the space available for Dalton is more favorable opposed to Petitioner's home." Dalton would have his own room at Patrick's house as opposed to sharing a room with his half-brother at Katrina's house. Aside from this aspect, Patrick's house was located in town, and Patrick testified that Dalton would be able to play with the neighborhood children after school. In contrast, Katrina's house was located in a rural area where their neighbors were about a mile away. Patrick testified that it was just Dalton, Ashley, and Robert

together after school in Oklahoma. At Katrina's house, however, the children were able to raise their livestock for 4-H shows. The evidence indicates that both types of living, city living versus country living, had advantages and disadvantages for Dalton.

The trial court again considered the relationship between Ashley and Dalton in finding 13 when it stated "[t]hat there is no persuasive evidence that the sibling relationship will be damaged." This finding sets forth an unproved assumption that the sibling relationship will not be damaged by the separation. To the contrary, Legg testified that Ashley and Dalton depended on each other emotionally and that this separation would be detrimental to both of them.

Findings 12, 14, 15, and 19 contain unproved assumptions that Patrick and Katrina will be motivated to maintain a long-term view of parenting if Dalton is sent to live with his father (finding 12), that the lack of communication between Patrick and Katrina will be improved if Dalton and Ashley are divided (finding 14), that changing Dalton's residence will resolve his feelings about being in the middle of his parents' conflict (finding 15), and that dividing Dalton and Ashley will promote the additional benefit of parenting inputs of both parents (finding 19).

I believe that the majority has conceded that findings 12, 13, 14, 15, and 19 are not actual factual findings but are rather opinions. At present, however, they remain tentative hypotheses which might very well prove false when additional evidence is collected. As a result, these findings were not supported by the record.

The remainder of the trial court's findings were imperatives and legal conclusions. Specifically, the trial court concluded that it would be in Dalton's best interests to reside with his father (finding 16) and that all of the facts constituted a material change of circumstances to change Dalton's custody (finding 17). The trial court directed that the parties continue in counseling (finding 18), that the exchange of Dalton should take place in El Reno, Oklahoma, on August 16, 2003 (finding 20), that visitation should allow Dalton and Ashley to be together on weekends and holidays (finding 21), that the parties should prepare a visitation schedule or go to mediation (finding 22), and that the parties should exchange child

support worksheets (finding 23). Because these statements were imperatives and legal conclusions, they offer no support for the trial court's conclusion that this was "an exceptional case." Therefore, it is unnecessary to address them any further.

I note that the majority states that Dalton was "a disturbed child." Nevertheless, in all the trial court's findings of fact, the trial court never stated that Dalton was a disturbed child. Appellate courts make no findings of fact on review of a trial court's judgment. See *Craig v. Hamilton,* 221 Kan. 311, 312, 559 P.2d 796 (1977) (It is not a function of the appellate court to make findings of fact.). Moreover, it is not the function of an appellate court to reweigh the evidence. *Barrett v. Ninnescah Bow Hunters Ass'n,* 15 Kan. App. 2d 241, 247, 806 P.2d 485, *rev. denied* 248 Kan. 994 (1991).

After reviewing the trial court's 23 findings, I believe that the only findings that were relevant to the trial court's holding that this was "an exceptional case" were those relating to Dalton's expressed preference to live with his father and the rational reasons for this preference (findings 9 and 10), and to the physical structure of Patrick's home (finding 11).

These findings were insufficient to support the trial court's conclusion of law that this was "an exceptional case." Although Dalton had expressed a preference to live with his father (finding 9), he wavered in these statements depending on the person with whom he was talking. Dalton was 8 years old at the time he made these statements. 24A Am. Jur. 2d, Divorce and Separation § 932 instructs: "When a child is of sufficient age and has intelligence and discretion to exercise judgments as to his or her future welfare, based upon facts and not mere whims, those wishes are one factor that, within context, should be considered by the trial judge in determining custody." In this case, Dalton's young age combined with his inconsistent statements about where he wanted to live indicated that he was not of sufficient age and intellect to make a rational decision concerning his residency.

Our Supreme Court in *Greene v. Greene,* 201 Kan. 701, 704, 443 P.2d 263 (1968), made the following statements about a child's preference in custody issues:

"A child's preference in custody matters may, of course, be considered as an aid to the court in making a proper order. [Citation omitted.] Such preference, however, is always subordinate to the over-all best interests and welfare of the child. Thus, when there are objective factors affecting the child's welfare that are contrary to his wishes, the latter must yield to the former. [Citation omitted.]"

Because the trial court omitted consideration of the previously mentioned objective statutory factors listed under K.S.A. 2003 Supp. 60-1610(a)(3)(B) from its findings and because the evidence was insufficient to establish that this was "an exceptional case," I would reverse.