619 S.E.2d 138

**CLIFFORD K. and Tina B., Petitioners Below**

**TINA B., Petitioner Below, Appellant,**

v.

**PAUL S., in His Official Capacity as Next Friend and Guardian of Z.B.S., an Infant, Respondent Below, Appellee.**

No. 31855.

Supreme Court of Appeals of West Virginia.

Submitted March 8, 2005.

Decided June 17, 2005.

Dissenting Opinion of Justice Maynard July 11, 2005.

Concurring Opinion of Justice Starcher, July 14, 2005.

Concurring and Dissenting Opinion of Justice Benjamin Aug. 8, 2005.

626

**630**

James Wilson Douglas, James Wilson Douglas, L.C., Sutton, West Virginia, Attorney for the Appellant.

Donald K. Bischoff, Summersville, West Virginia, Attorney for the Appellee.

Jeffrey L. Hall, Diana, West Virginia, Attorney for Amicus Curiae Jeffrey L. Hall in his capacity as Guardian ad Litem for the minor child, Z.B.S.

Leslie Cooper, American Civil Liberties Union, Lesbian and Gay Rights Project, New York, NY, Terri S. Baur, American Civil Liberties Union of West Virginia Foundation, Charleston, West Virginia, Attorneys for Amici Curiae Lesbian and Gay Rights Project of the American Civil Liberties Union and the American Civil Liberties Union of West Virginia Foundation.

Mary Downey, Charleston, West Virginia, Gregory R. Nevins, Lambda Legal Defense and Education Fund, Inc., Atlanta, GA, Shannon Minter, Courtney Joslin, National Center for Lesbian Rights, San Francisco, CA, for Amici Curiae Lambda Legal Defense and Education Fund, Inc., and National Center for Lesbian Rights.

DAVIS, Justice:

The appellant herein and petitioner below, Tina B.,[1] appeals from an order entered December 2, 2003, by the Circuit Court of Clay County. By the terms of that order, the circuit court denied Tina B.'s petition for custody of the minor child, Z.B.S., who Tina B. had raised from infancy with her now-deceased partner, finding that Tina B. lacked standing to seek an award of custody under W. Va.Code § 48–9–103 (2001) (Repl.Vol. 2004). Additionally, the circuit court granted temporary custody of Z.B.S. to his maternal grandfather, the appellee herein and respondent below, Paul S. On appeal to this Court, Tina B. complains that the circuit court erred by finding that she lacked standing to assert her status as Z.B.S.'s psychological parent and to seek his custody in such capacity. Upon a review of the parties' arguments, the record presented for appellate consideration, and the pertinent authorities, we conclude that Tina B. is a proper party to seek custody of Z.B.S. Accordingly, we reverse the contrary decision of the Clay County Circuit Court.

## I.

### FACTUAL AND PROCEDURAL HISTORY

---

1. In accordance with our practice in similar cases involving sensitive matters, we will refer to the parties by their last initials rather than by their full surnames. *See, e.g., In re Stephen Tyler R.,* 213 W.Va. 725, 729 n. 1, 584 S.E.2d 581, 585

n. 1 (2003); *Tackett v. American Motorists Ins. Co.,* 213 W.Va. 524, 526 n. 1, 584 S.E.2d 158, 160 n. 1 (2003); *In re Emily,* 208 W.Va. 325, 329 n. 1, 540 S.E.2d 542, 546 n. 1 (2000).

The facts [2] underlying the instant proceeding are not disputed by the parties. Tina B. and the decedent, Christina S., began living together on approximately November 1, 1998. During the course of their relationship, Tina B. and Christina S. decided they would like to have a child together. Thereafter, Clifford K., petitioner below, was enlisted to help Christina S. conceive a child. Z.B.S., the biological child of Christina S. and Clifford K., was born on December 25, 1999, and, following his birth, Z.B.S. resided continuously with Christina S. and Tina B. as their son.

Tragically, Christina S. died as a result of injuries she sustained in a motor vehicle accident on June 1, 2002. On that same day, while Tina B. was still hospitalized as a result of injuries she had sustained in the aforementioned accident, Paul S., the father of Christina S. and the maternal grandfather of Z.B.S., assumed physical custody of the child. Afterwards, on June 10, 2002, Paul S. sought the office of and was appointed guardian of Z.B.S. by the Clay County Commission as a result of Christina S.'s death. Thereafter, Clifford K. and Tina B. jointly filed a petition for custody of Z.B.S. on July 16, 2002; although Clifford K. was a party to the petition for custody, he apparently did so on Tina B.'s behalf and not because he sought custody of Z.B.S. for himself.[3]

By Temporary Order entered September 23, 2002, the Family Court of Clay County awarded equal visitation with Z.B.S. to both Tina B. and Clifford K., and granted Paul S. temporary custody of Z.B.S. Upon the conclusion of this hearing, a guardian ad litem for the minor child was appointed and extensive psychological evaluations of all parties were conducted. The guardian ad litem recommended that sole custody of Z.B.S. be awarded to Tina B. because she is his "second mother, by design and in actuality," with reasonable visitation by Clifford K., Paul. S.,

and Paul S.'s wife, who is Christina S.'s mother and Z.B.S.'s maternal grandmother. In light of the guardian ad litem's recommendations and the psychological evaluations, the family court, by Final Order entered July 25, 2003, found that "Tina B[.] has standing to seek custody of Z.B.S.as a 'psychological parent' due to the significant caretaking services she provided prior to the death of Christin[a] S[.] and the strong parent-child bond that now exists between Tina B[.] and Z.B.S." The court then awarded primary custody of Z.B.S. to Tina B. based upon Tina B.'s status as the child's psychological parent and because such a placement served the child's best interests by promoting "[t]he stability of the child and the continuity of existing parent-child relationships." Shared custody by way of visitation rights, denominated "custodial time," was awarded to both Clifford K. and Paul S. and his wife.

Paul S. appealed the family court's adverse ruling to the Circuit Court of Clay County. By Order of Remand entered December 2, 2003, the circuit court adopted the family court's findings but determined, instead, that "[Tina] B[.] does not have standing to seek custody of the infant child" under W. Va. Code § 48–9–103 [4] because "[s]he is not the legal parent of Z.B.S., [and] ... the concept of 'psychological parent' [has not been extended] to include the former same sex partner of a biological parent." Based upon this ruling, the circuit court transferred temporary custody of Z.B.S. to Paul S., and granted visitation to Tina B. The court further remanded the case to the family court for an award of the permanent custody of Z.B.S. to either Clifford K. or Paul S.

Following the circuit court's order awarding temporary custody of Z.B.S. to Paul S., the family court, by order entered January 6, 2004, refused Tina B.'s motion to stay the circuit court's order and continued custody in

**2.** By order of this Court, entered September 16, 2004, the record in this case has been sealed upon the request of Tina B. Accordingly, only those facts that are essential to our consideration and determination of this matter will be recited in this opinion.

**3.** In fact, Clifford K. not only acquiesces in an award of custody to Tina B.; he has not actively

sought custody of his son and has chosen not to participate in the instant appeal.

**4.** W. Va.Code § 48–9–103 (2001) (Repl.Vol.2004) establishes who may bring or participate in proceedings seeking to establish custody of a child. For the complete text of W. Va.Code § 48–9–103, see Section III, *infra*.

Paul S. Thereafter, the family court, on remand, entered a Permanent Custody Order on March 2, 2004, recognizing the circuit court's ruling finding that Tina B. did not have standing to seek custody of Z.B.S.; awarding custody to Clifford K., as the natural father of Z.B.S.; and granting permanent shared parenting time in the form of visitation to Paul S. and Tina B., with Tina's parenting time to coincide with Clifford K.'s parenting time. From that order, Paul S. appealed to the circuit court, which reversed the family court's ruling by Second Order of Remand entered May 3, 2004, concluding that "the family court did indirectly what the family court could not do directly which is to award petitioner, Tina B[.], custody of the infant child, Z.B.S." The circuit court then ordered that Paul S. receive temporary custody of Z.B.S.; awarded visitation to Tina B.; and again directed the family court to determine whether Clifford K. or Paul S. should be granted custody of Z.B.S.

During the pendency of the family court remand proceedings and Paul S.'s ensuing appeal to the circuit court, Tina B. petitioned this Court for appeal from the Clay County Circuit Court's December 2, 2003, first Order of Remand which had directed the family court to determine who, as between Clifford K. and Paul S., should be granted permanent custody of Z.B.S. By order entered September 2, 2004, this Court granted Tina B.'s petition for appeal; stayed the circuit court's December 2, 2003, and May 3, 2004, orders transferring custody to and maintaining custody in Paul S.; and reinstated the family court's July 25, 2003, Final Order awarding primary custody to Tina B.

## II.

### STANDARD OF REVIEW

■ The sole issue presented for resolution by the instant appeal is whether the circuit court properly interpreted W. Va. Code § 48-9-103 as precluding Tina B. from seeking custody of Z.B.S. When considering the correctness of decisions rendered by a circuit court that were based upon a family court's ruling, we apply a multifaceted review:

In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law de novo.

Syl., Carr v. Hancock, 216 W.Va. 474, 607 S.E.2d 803 (2004). See also Syl. pt. 2, Lucas v. Lucas, 215 W.Va. 1, 592 S.E.2d 646 (2003) ("In reviewing challenges to findings made by a family court judge that also were adopted by a circuit court, a three-pronged standard of review is applied. Under these circumstances, a final equitable distribution order is reviewed under an abuse of discretion standard; the underlying factual findings are reviewed under a clearly erroneous standard; and questions of law and statutory interpretations are subject to a de novo review.").

■ Of particular relevance to the case sub judice is our specific manner of reviewing the correctness of orders determining child custody:

The exercise of discretion by a trial court in awarding custody of a minor child will not be disturbed on appeal unless that discretion has been abused; however, where the trial court's ruling does not reflect a discretionary decision but is based upon an erroneous application of the law and is clearly wrong, the ruling will be reversed on appeal.

Syl. pt. 2, Funkhouser v. Funkhouser, 158 W.Va. 964, 216 S.E.2d 570 (1975), superseded by statute on other grounds as stated in David M. v. Margaret M., 182 W.Va. 57, 385 S.E.2d 912 (1989).

■ Lastly, we accord plenary review to matters involving statutory interpretation: "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a de novo standard of review." Syl. pt. 1, Chrystal R.M. v. Charlie A.L., 194 W.Va. 138, 459 S.E.2d 415 (1995). Accord Syl. pt. 1, Appalachian Power Co. v. State Tax Dep't of West Virginia, 195 W.Va. 573, 466 S.E.2d 424 (1995) ("Interpreting a statute or an adminis-

trative rule or regulation presents a purely legal question subject to *de novo* review."). Mindful of these standards, we proceed to consider the parties' arguments.

## III.

## DISCUSSION

On appeal to this Court, Tina B. challenges the circuit court's decision concluding that she does not have standing to seek custody of the minor child, Z.B.S., who has resided with her since his birth and whom she has raised and cared for, with her now-deceased partner, since that time. In so ruling, the circuit court determined that Tina B. did not meet any of the criteria enumerated in W. Va.Code § 48–9–103 so as to entitle her to participate in Z.B.S.'s custody proceeding. Before this Court, Tina B contends that, as the psychological parent of the minor child, she is entitled to participate in his custody proceeding and to seek an award of custody. By contrast, Paul S. contends that the circuit court properly denied Tina B. custody of Z.B.S. Z.B.S., appearing by and through his guardian ad litem, agrees with Tina B.'s contentions and suggests that his best interests would be served by awarding his custody to Tina B.[5]

■ At issue in this proceeding is the solitary question of whether Tina B. is statutorily authorized to seek custody of Z.B.S. To determine this issue, it is necessary to examine not only the statute governing which parties are entitled to participate in custody proceedings, W. Va.Code § 48–9–103 (2001) (Repl.Vol.2004),[6] but also those canons of statutory construction which guide our analysis of this statutory language. The cardinal rule of statutory interpretation is to first identify the legislative intent expressed in the promulgation at issue. To this end, we have recognized that "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r,* 159 W.Va. 108, 219 S.E.2d 361 (1975). We next scrutinize the specific language employed in the enactment. "A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syllabus point 2, *State v. Epperly,* 135 W.Va. 877, 65 S.E.2d 488 (1951). *Accord DeVane v. Kennedy,* 205 W.Va. 519, 529, 519 S.E.2d 622, 632 (1999) ("Where the language of a statutory provision is plain, its terms should be applied as written and not construed." (citations omitted)).

■ Where, however, the statute's terms are less clear, statutory construction, rather than strict application, is appropriate. In such instances, "[j]udicial interpretation of a statute is warranted only if the statute is ambiguous and the initial step in such interpretative inquiry is to ascertain the legislative intent." Syl. pt. 1, *Ohio County Comm'n v. Manchin,* 171 W.Va. 552, 301 S.E.2d 183 (1983). *Accord* Syl. pt. 1, *Farley v. Buckalew,* 186 W.Va. 693, 414 S.E.2d 454 (1992) ("A statute that is ambiguous must be construed before it can be applied."). Furthermore, statutory construction is necessary to ascertain the meaning of undefined words and phrases. "In the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used." Syl. pt. 1, *Miners in Gen. Group v. Hix,* 123 W.Va. 637, 17 S.E.2d 810 (1941), *overruled on other grounds by Lee–Norse Co. v. Rutledge,* 170 W.Va. 162, 291 S.E.2d 477 (1982).

■ Applying the aforementioned analytical framework, we first consider the Legisla-

---

5. We note the appearance of the various Amici Curiae in this case, Jeffrey L. Hall, Guardian ad Litem for Z.B.S.; Lambda Legal Defense and Education Fund, Inc.; National Center for Lesbian Rights; Lesbian and Gay Rights Project of the American Civil Liberties Union; and the American Civil Liberties Union of West Virginia Foundation, and our appreciation of their participation in this proceeding.

6. W. Va.Code § 48–9–103 (2001) (Repl.Vol.2004) identifies parties to an action allocating the custodial and decision-making responsibility of children. The full text of this statute will be discussed *infra* in the body of this opinion.

ture's intention in enacting. W. Va.Code § 48–9–103. Companion statutes to this provision make it abundantly clear that the primary aim of this legislation is to secure custodial placements of children that serve their best interests and to promote stability and continuity with those parents or parental figures with whom such children have formed an emotional attachment bond. W. Va.Code § 48–9–101(b) (2001) (Repl.Vol.2004) poignantly states that "[t]he Legislature finds and declares that it is the public policy of this state to assure that the best interest of children is the court's primary concern in allocating custodial and decision-making responsibilities between parents who do not live together." Similarly, W. Va.Code § 48–9–102 (2001) (Repl.Vol.2004) enumerates specific factors that are essential to promoting and safeguarding the best interests standard:

(a) The primary objective of this article is to serve the child's best interests, by facilitating:

(1) Stability of the child;

(2) Parental planning and agreement about the child's custodial arrangements and upbringing;

(3) Continuity of existing parent-child attachments;

(4) Meaningful contact between a child and each parent;

(5) Caretaking relationships by adults who love the child, know how to provide for the child's needs, and who place a high priority on doing so;

(6) Security from exposure to physical or emotional harm; and

(7) Expeditious, predictable decision-making and avoidance of prolonged uncertainty respecting arrangements for the child's care and control.

(b) A secondary objective of [this] article is to achieve fairness between the parents.

■■■ These legislative statements of purpose also are consistent with this Court's pronouncements identifying the best interests of the child as being the paramount consideration by which custody determinations should be made. We repeatedly have held that " '[i]n a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided.' Point 2, Syllabus, *State ex rel. Lipscomb v. Joplin*, 131 W.Va. 302[, 47 S.E.2d 221 (1948) ]." Syl. pt. 1, *State ex rel. Cash v. Lively*, 155 W.Va. 801, 187 S.E.2d 601 (1972). *See also* Syl. pt. 3, in part, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996) ("Although parents have substantial rights that must be protected, the primary goal . . . in all family law matters . . . must be the health and welfare of the children."); Syl. pt. 5, *Carter v. Carter*, 196 W.Va. 239, 470 S.E.2d 193 (1996) ("In visitation as well as custody matters, we have traditionally held paramount the best interests of the child."); *David M. v. Margaret M.*, 182 W.Va. 57, 60, 385 S.E.2d 912, 916 (1989) (The "child's welfare is the paramount and controlling factor in all custody matters." (citations omitted)). Thus, "[t]o justify a change of child custody, in addition to a change in circumstances of the parties, it must be shown that such change would materially promote the welfare of the child." Syl. pt. 2, *Cloud v. Cloud*, 161 W.Va. 45, 239 S.E.2d 669 (1977) (per curiam).

To further promote this stated goal to safeguard the best interests of children, the Legislature has recognized that, in certain circumstances, persons who are not a child's parent or legal guardian might also be proper parties to a custody proceeding. In this regard, the statute at issue in this proceeding, W. Va.Code § 48–9–103 (2001) (Repl.Vol. 2004), delineates who may participate in actions involving custodial determinations by identifying various categories of persons who have statutorily been granted permission to participate in custodial determination actions:

(a) Persons who have a right to be notified of and participate as a party in an action filed by another are:

(1) A legal parent of the child, as defined in section 1–232 [§ 48–1–232] of this chapter;

(2) An adult allocated custodial responsibility or decision-making responsibility under a parenting plan regarding the child that is then in effect; or

(3) Persons who were parties to a prior order establishing custody and visitation,

or who, under a parenting plan, were allocated custodial responsibility or decision-making responsibility.

(b) In exceptional cases the court may, in its discretion, grant permission to intervene to other persons or public agencies whose participation in the proceedings under this article it determines is likely to serve the child's best interests. The court may place limitations on participation by the intervening party as the court determines to be appropriate. Such persons or public agencies do not have standing to initiate an action under this article.

W. Va.Code § 48–9–103. Of the four enumerated classes, the parties agree that neither subsection (a)(2) nor subsection (a)(3) applies to the case *sub judice* insofar as no parenting plan or custodial and visitation order has previously been entered regarding Z.B.S. *See* W. Va.Code §§ 48–9–103(a)(2–3). *See also* W. Va.Code § 48–1–235.3 (2001) (Repl.Vol.2004) (defining "parenting plan").[7]

The parties disagree, however, as to which of the remaining subsections of W. Va.Code § 48–9–103 is applicable to the facts at issue herein and whether the pertinent provision permits Tina B. to participate in Z.B.S.'s custody proceeding. Tina B. contends that she is Z.B.S.'s legal parent and thus is entitled to participate in the proceedings pursuant to W. Va.Code § 48–9–103(a)(1). By contrast, Paul S. asserts that the only provision that could conceivably grant Tina B. permission to participate in these proceedings is W. Va.Code § 48–9–103(b) and that, even under that subsection, Tina B. is not entitled to custody of Z.B.S. We will consider each of these arguments in turn.

### A. W. Va.Code § 48–9–103(a)(1)

■ Tina B. contends that she is the legal parent of Z.B.S., and, thus, she is entitled to seek his custody pursuant to W. Va.

Code § 48–9–103(a)(1). "Legal parent" is defined in W. Va.Code § 48–1–232 (2001) (Repl.Vol.2004) as "an individual defined as a parent, by law, on the basis of biological relationship, presumed biological relationship, legal adoption or other recognized grounds." From this definition, Tina B. does not qualify as Z.B.S.'s legal parent under the first two enumerated criteria because she has neither a biological nor a presumed biological relationship with him. Furthermore, Tina B. has not formally adopted Z.B.S. so she does not qualify as his legal parent on that basis. The final manner in which Tina B. may qualify as the legal parent of Z.B.S. is if she has been determined to be his parent on the basis of "other recognized grounds". W. Va. Code § 48–1–232. Under the facts of the instant proceeding, however, we reject Tina B.'s argument that she meets this definition as such a construction is not contemplated by the expressed legislative intent.

■ In stating who may be a child's "legal parent," the Legislature has left undefined the qualification described as "other recognized grounds." *See* W. Va.Code § 48–1–232. Absent precise legislative guidance, we must defer instead to the "common, ordinary and accepted meaning [of the terms] in the connection in which they are used." Syl. pt. 1, in part, *Miners in Gen. Group v. Hix,* 123 W.Va. 637, 17 S.E.2d 810. The customary construction of the word "recognized" is "[a]cknowledged, admitted; known." VIII The Oxford English Dictionary 253 (1970 reissue). More specifically, to "recognize" is "to acknowledge formally." Webster's Ninth New Collegiate Dictionary 984 (9th ed.1983). *Accord* Random House Webster's Unabridged Dictionary 1611 (2d ed.1998) (defining "recognize" as "to acknowledge or accept formally a specified factual or legal situation . . . to acknowledge or treat as valid"). *See also Price v. United States,* 121 Ct.Cl. 664,

---

7. W. Va.Code § 48–1–235.3 (2001) (Repl.Vol. 2004) defines a "[p]arenting plan" as "a temporary parenting plan as defined in subdivision (22) of this section or a permanent parenting plan as defined in subdivision (17) of this section." Though defined in an earlier version of the domestic relations statutes, "temporary parenting plan" is no longer statutorily defined. However, "[p]ermanent parenting plan" means a plan for parenting a child that is incorporated into a

final order or subsequent modification order in a domestic relations action. The plan principally establishes, but is not limited to, the allocation of custodial responsibility and significant decision-making responsibility and provisions for resolution of subsequent disputes between the parents.

W. Va.Code § 48–1–235.4 (2001) (Repl.Vol. 2004).

100 F.Supp. 310, 316 (Ct.Cl. 1951) (construing word "recognize" as meaning "to acknowledge by admitting to a privileged status" (internal quotations and citation omitted)). Thus, it is apparent that the Legislature's reference to "other recognized grounds" in W. Va.Code § 48–1–232 contemplates a formal acknowledgment of parental status or the functional equivalent thereof. A brief survey of this State's statutory law regarding the care and custody of minor children provides several examples of the above-referenced "other recognized grounds" wherein the Legislature has formally acknowledged parental status or has recognized its functional equivalent.

For example, the Legislature has determined that, in paternity proceedings, a man may automatically be declared to be a child's legal father in certain circumstances. Where there exists scientific certainty that a man is the subject child's biological father, he is denominated as such: "Undisputed blood or tissue test results which show a statistical probability of paternity of more than ninety-eight percent shall, when filed, *legally establish* the man as the father of the child for all purposes and child support may be established pursuant to the provisions of this chapter." W. Va.Code § 48–24–103(a)(3) (2002) (Repl.Vol.2004) (emphasis added). *Accord* Syl. pt. 5, *Mildred L.M. v. John O.F.*, 192 W.Va. 345, 452 S.E.2d 436 (1994) ("Under W. Va.Code, 48A–6–3 (1992), undisputed blood or tissue test results indicating a statistical probability of paternity of more than ninety-eight percent are conclusive on the issue of paternity, and the circuit court should enter judgment accordingly.").

Likewise, a man who acknowledges that he is the subject child's father will be legally declared as such: "A written, notarized acknowledgment executed pursuant to the provisions of section twelve [§ 16–5–12], article five, chapter sixteen of this code *legally establishes* the man as the father of the child for all purposes and child support may be established in accordance with the support guidelines set forth in article 13–101, et seq. [§§ 48–13–101 et seq.]." W. Va.Code § 48–24–106 (2001) (Repl.Vol.2004) (emphasis added). *See also* Syl. pt. 2, *State ex rel. W. Va. Dep't of Health & Human Res., Child Support Div. v. Cline*, 197 W.Va. 79, 475 S.E.2d 79 (1996) ("Absent a judicial determination that an acknowledgment of paternity was entered into under fraud or duress, a written notarized acknowledgment by both the man and woman that the man is the father of the named child *legally and irrevocably establishes* the man as the father of the child for all purposes including child support obligations." (emphasis added)). In either circumstance, the formal recognition of paternity accords the man unrestricted parental status as the child's legal father, accompanied by a duty to support the child and to repay past due child support obligations. *See* W. Va.Code § 48–24–104 (2001) (Repl. Vol.2004).

Additionally, the Legislature has declared that, in adoption proceedings, the male parent of a child will be accorded "determined father" or "legal father" parental status depending upon the circumstances surrounding such a denomination. Based upon the nuances of a particular factual scenario, a man may be declared to be the subject child's "[d]etermined father":

"Determined father" means, before adoption, a person: (1) In whom *paternity has been established* pursuant to the provisions of article 24–101 et seq. [§§ 48–24–101 et seq.], and section 16–5–12, whether *by adjudication or acknowledgment* as set forth therein; *or* (2) who has been *otherwise judicially determined* to be the biological father of the child entitled to parental rights; or (3) who has asserted his paternity of the child in an action commenced pursuant to the provisions of article 24–101, et seq., that is pending at the time of the filing of the adoption petition.

W. Va.Code § 48–22–109 (2001) (Repl.Vol. 2004) (emphasis added). In other situations, the man may be denominated as the child's "[l]egal father":

"Legal father" means, before adoption, the male person having the *legal relationship* of parent to a child: (1) Who is married to its mother at the time of conception; or (2) who is married to its mother at the time of birth of the child; or (3) who is the biological father of the child and who

marries the mother before an adoption of the child.

W. Va.Code § 48–22–110 (2001) (Repl.Vol. 2004) (emphasis added). Regardless of the appellation that is factually appropriate in a given case, the status of both a determined father and a legal father are accompanied by legal rights to the care and custody of the minor child such that the consent to adoption or relinquishment of parental rights of either a determined father or a legal father is required before his child may be adopted by another person. *See* W. Va.Code §§ 48–22–301(a)(1,4) (2001) (Repl.Vol.2004) ("[C]onsent to or relinquishment for adoption of a minor child is required of: (1) The parents or surviving parent, whether adult or infant, of a marital child ... and(4) The determined father.").

Moreover, the Legislature has recognized the functional equivalent of parental status to exist in certain circumstances. For example, one who is appointed or nominated as a guardian upon the death of a minor child's parent(s) is formally accorded rights and responsibilities that are substantially the same as those that would have been enjoyed by the child's parent(s). *See* W. Va.Code § 44–10–1 (1923) (Repl.Vol.2004) (describing "[t]estamentary guardians"); W. Va.Code § 44–10–3 (2004) (Repl.Vol.2004) (concerning judicial appointment of guardian); W. Va.Code § 44–10–4 (2004) (Repl.Vol.2004) (addressing ability of older child to nominate his/her guardian upon death of child's parent(s)). Under such circumstances, the guardian essentially steps into the shoes of the deceased parent(s) to fulfill the parental role as a result of the inability of the parent(s) to do so.

In this regard, a guardian appointed or nominated upon the death of a minor child's parent(s) "shall have the possession, care and management of his ward's estate, real and personal, and out of the proceeds of such estate shall provide for his maintenance and education; and shall have also, except as otherwise provided in this article, the custody of his ward." W. Va.Code § 44–10–7 (1996) (Repl.Vol.2004). A guardian also possesses legal rights to the child such that the guardian's consent is required before the child may be adopted. *See* W. Va.Code

§ 48–22–301(d) (2001) (Repl.Vol.2004) ("If all persons entitled to parental rights of the child sought to be adopted are deceased ... then consent or relinquishment is required of the legal guardian or any other person having legal custody of the child at the time.").

Similarly, the Legislature has accorded the West Virginia Department of Health and Human Resources the functional equivalent of parental status in cases involving the abuse, neglect, and/or abandonment of a child. In such cases, "[i]t shall be the responsibility of the state department to provide care for neglected children who are committed to its care for custody or guardianship." W. Va. Code § 49–2–1 (1998) (Repl.Vol.2004).

A child committed to the state department for guardianship, after termination of parental rights, shall remain in the care of the department until he attains the age of eighteen years, or is married, or is adopted, or guardianship is relinquished through the court.

A child committed to the state department for custody shall remain in the care of the department until he attains the age of eighteen years, or until he is discharged because he is no longer in need of care. W. Va.Code § 49–2–2 (1972) (Repl.Vol.2004). Although a distinction has been made between children whose guardianship, as distinguished from custody, has been committed to the State, it is nevertheless apparent that, in both instances, the State steps into a parental-type role insofar as it retains ultimate responsibility for the health and welfare of the subject child.

When a child's custody has been awarded to the State, the Legislature has additionally vested the State with sufficient legal rights to the child to require its consent to the child's adoption if the parental rights of the child's parents are ultimately terminated or relinquished. *Compare* W. Va.Code § 49–3–1(a)(1) (2001) (Repl.Vol.2004) ("Whenever ... the department of health and human resources has been given the permanent legal and physical custody of any child and the rights of the mother and the rights of the legal, determined, putative, outside or unknown father of the child have been terminated by order of a court of com-

petent jurisdiction or by a legally executed relinquishment of parental rights, ... the department may consent to the adoption of the child pursuant to the provisions of article twenty-two [§§ 48–22–101 et seq.], chapter forty-eight of this code.") *with* W. Va. Code § 48–22–301(d) (2001) (Repl.Vol.2004) ("If all persons entitled to parental rights of the child sought to be adopted ... have been deprived of the custody of the child by law, then consent or relinquishment is required of the legal guardian or any other person having legal custody of the child at the time.").

 " 'The Legislature, when it enacts legislation, is presumed to know its prior enactments.' Syllabus Point 12, *Vest v. Cobb*, 138 W.Va. 660, 76 S.E.2d 885 (1953)." Syl. pt. 5, *Pullano v. City of Bluefield*, 176 W.Va. 198, 342 S.E.2d 164 (1986). Based upon the foregoing analysis, it is evident that our construction of the phrase "other recognized grounds" is consistent with the Legislature's intent in employing that terminology when it defined "legal parent" in W. Va.Code § 48–1–232 and in keeping with the parameters of parental status, or comparable rights and responsibilities, that the Legislature has bestowed upon individuals in certain enumerated circumstances in order to safeguard the best interests of the children involved. Accordingly, we hold that, pursuant to W. Va. Code § 48–1–232 (2001) (Repl.Vol.2004), a "legal parent" is "an individual defined as a parent, by law, on the basis of biological relationship, presumed biological relationship, legal adoption or other recognized grounds." The phrase "other recognized grounds" refers to those individuals or entities who have been formally accorded parental status or the functional equivalent thereof by way of statute or judicial decree. Such parental status is comparable to the rights and responsibilities of a biological or adoptive parent and includes, but is not limited to, the right to care, control, and custody of the minor child; the right to consent or object to the child's adoption by another person; and the duty to support the child.[8]

Applying this construction to the facts presently before us, we are unable to accord Tina B. status as Z.B.S.'s legal parent. Her relationship with Z.B.S. does not fall neatly into any of the categories described above in which the Legislature has specifically bestowed parental status. Neither has Tina B. adopted Z.B.S. Most closely analogous to the case *sub judice* is the appointment or nomination of a guardian upon the death of the child's parent. Unfortunately, however, there is no record evidence to support a finding that Christina S. made such a testamentary appointment of guardianship in favor of Tina B. Moreover, the judicial appointment of a guardian for Z.B.S. upon Christina S.'s death was made in favor of Paul S. While the aforementioned examples of "other recognized grounds" are by no means the only instances in which legal par-

---

**8.** This construction of the definition of "legal parent" is consistent with other jurisdictions that have interpreted this term. *See, e.g., In re Marriage of Simmons,* 355 Ill.App.3d 942, 292 Ill. Dec. 47, 825 N.E.2d 303 (2005) (observing that Illinois Parentage Act, 750 Ill. Comp. Stat. Ann. 45/5(a)(1–2), treats husband whose wife has been artificially inseminated as natural father of child conceived as a result of such procedure); *Hernandez v. Robles,* 7 Misc.3d 459, 794 N.Y.S.2d 579 (2005) (automatically according legal parent status to person whose spouse conceives a child with donor sperm); *In re Marriage of Wilson,* 199 Or.App. 242, 246 n. 1, 110 P.3d 1106, 1108 n. 1 (2005) (using term "legal parent" to refer to " 'natural' parents and 'adoptive' parents" as distinguished from "foster parents, stepparents, and other nonparents" (citation omitted)); *In re H.A.L.,* No. M2005–00045–COA–R3–PT, 2005 WL 954866 (Tenn.Ct.App. Apr.25, 2005) (noting that statutory definition of "legal parent" contained in Tenn.Code Ann. § 36–1–102(28)(D) includes a child's biological and adoptive parents). *See also* Black's Law Dictionary 1137 (7th ed. 1999) ("In ordinary usage, the term ['parent'] denotes more than responsibility for conception and birth. The term commonly includes (1) either the natural father or the natural mother of a child, (2) the adoptive father or adoptive mother of a child, (3) a child's putative blood parent who has expressly acknowledged paternity, and (4) an individual or agency whose status as guardian has been established by judicial decree."). *But see Chambers v. Chambers,* No. CN99–09493, 00–09295, 2005 WL 645220 (Del.Fam.Ct. Jan.12, 2005) (determining rights of de facto parent to be on par with those of biological or legal parent for purposes of obligation to support child conceived through in vitro fertilization); *In re Parentage of A.B.,* 818 N.E.2d 126, 131–32 (Ind.Ct.App.2004) (according legal co-parent status to same-sex partner of woman who had agreed, with partner, to conceive child through artificial insemination).

ent status might be accorded, they are indicative of a definite legislative intent to formally recognize someone who is not biologically or adoptively related to a child as the child's functional parental equivalent. Absent further record evidence or legal authority to support Tina B.'s claims, we simply cannot conclude that she meets the definition of a "legal parent" set forth in W. Va.Code § 48–1–232. Accordingly, Tina B. is foreclosed from seeking custody of Z.B.S. pursuant to W. Va.Code § 48–9–103(a)(1), which accords such standing only to "legal parents".

### B. W. Va.Code § 48–9–103(b)

■ Despite her inability to participate in the custodial determinations regarding Z.B.S. as the child's legal parent, Tina B. may nevertheless still be granted permission to intervene in such custodial proceedings if she satisfies the requirements of W. Va.Code § 48–9–103(b). Paul S. contends that W. Va.Code § 48–9–103(b) is dispositive of the instant controversy and that it denies Tina B. standing to seek custody of Z.B.S. We agree with Paul S. insofar as we find subsection (b) to be determinative of the resolution of the matter presently before us. We disagree, however, with Paul S.'s construction of W. Va.Code § 48–9–103(b) as denying Tina B. the opportunity to participate in a determination of Z.B.S.'s custody.

W. Va.Code § 48–9–103(b) (2001) (Repl. Vol.2004) directs that

[i]n exceptional cases the court may, in its discretion, grant permission to intervene to other persons or public agencies whose participation in the proceedings under this article it determines is likely to serve the child's best interests. The court may place limitations on participation by the intervening party as the court determines to be appropriate. Such persons or public agencies do not have standing to initiate an action under this article.

In other words, a person may, subject to the exercise of the court's discretion, intervene in a proceeding adjudicating custody if the facts of the particular case warrant such intervention and if the intervention is likely to promote the best interests of the subject child(ren). *See* W. Va.Code § 48–9–103(b).

■ At this juncture, we feel it is necessary to address the procedural manner in which the case *sub judice* was initiated in the Family Court of Clay County. Paul S. complains that, because Tina B. joined in the filing of this lawsuit with Clifford K., she is not now entitled to participate in these proceedings as an intervenor. While we appreciate the less-than-perfect procedural posture of this case, we do not think this imperfect style of pleading disentitles Tina B. to participate in these proceedings.

Under subsection (b) of W. Va.Code § 48–9–103, if the facts of the case and the best interests of Z.B.S. so warrant, Tina B. could be granted permission to intervene in a suit seeking his custody, but, pursuant to the plain statutory language, she could not initiate such an action herself. *See* W. Va.Code § 48–9–103(b). Nevertheless, the instant proceeding was initiated by both Clifford K. and Tina B. as joint petitioners, rather than having been filed by Clifford K. with Tina B. moving to intervene therein. This procedural posture is not fatal to our consideration of the matter, however, because the family court has cured this defect by apparently treating Tina B.'s petition as a motion for intervention and finding that she is a proper party to these proceedings. Arguably, it would have been preferable for Clifford K. to have filed the underlying custody proceeding and for Tina B. to have moved to intervene in that case pursuant to the plain language of W. Va.Code § 48–9–103(b).[9] However, "[w]e decline to delay the resolution of these pivot-

9. Alternatively, Tina B. could have initiated an action to formally obtain custody of Z.B.S. from Clifford K. because our prior case law entitles a third party to seek a change in custody from a child's natural parent. *See* Syl. pt. 1, *Overfield v. Collins*, 199 W.Va. 27, 483 S.E.2d 27 (1996) ("Any attempt by a non-parent to judicially change the care and custody of a child from a natural parent must precede that attempt with: (1) the filing of a petition setting forth all of the reasons why the change of custody is required; and (2) the service of that petition, together with a reasonable notice as to the time and place that petition will be heard. Following the filing and service of the petition and notice of hearing upon that petition, the natural parents whose rights are being affected shall have the right to: (1) present evidence as to the reasons why custody should not be changed; and (2) obtain a decision from a neutral, detached person or tribunal.").

al issues on technical procedural grounds, particularly because all necessary parties appear to be before the court." *Zikos v. Clark,* 214 W.Va. 235, 241, 588 S.E.2d 400, 406 (2003) (per curiam). Furthermore, we previously have stated that " 'a mere procedural technicality does not take precedence over the best interests of the child[.]' " *In re Erica C.,* 214 W.Va. 375, 380, 589 S.E.2d 517, 522 (2003) (per curiam) (quoting *In re Tyler D.,* 213 W.Va. 149, 160, 578 S.E.2d 343, 354 (2003) (per curiam)). In short, we refuse to elevate form over substance when the family court has found that Tina B. was a proper party to the proceedings commenced in that tribunal. *See May v. May,* 214 W.Va. 394, 399 n. 10, 589 S.E.2d 536, 541 n. 10 (2003) ("The distinctions elevate form over substance and do not affect the ultimate outcome[.]"); *Brooks v. Isinghood,* 213 W.Va. 675, 684, 584 S.E.2d 531, 540 (2003) (observing importance of "insur[ing] that cases and controversies be determined upon their merits and not upon legal technicalities or procedural niceties" (internal quotations, citation, and footnote omitted)); *Dunlap v. Friedman's, Inc.,* 213 W.Va. 394, 399, 582 S.E.2d 841, 846 (2003) (Davis, J., dissenting) (noting that a conclusion which "elevates form over substance ... defies common statutory construction" (internal quotations and citation omitted)). Consequently, we, too, will treat Tina B. as if she had intervened in the lower court proceedings pursuant to W. Va.Code § 48-9-103(b) and now consider whether that statutory language entitles her to do so.

Turning back to the statutory requirements for one to be accorded permission to intervene in a custody determination proceeding, then, it is apparent that if Tina B. can demonstrate that the facts surrounding Z.B.S.'s custodial determination are such as to be "exceptional," she would, subject to the court's discretion and the best interests of Z.B.S., be entitled to intervene in such proceedings. *See* W. Va.Code § 48-9-103(b). As with our prior analysis of the meaning of "other recognized grounds," however, the Legislature has left undefined "exceptional cases".

■ In custodial proceedings, the Legislature has reserved the right to participate therein to a child's parents and custodians and to certain other persons who are permitted to intervene in specific cases. *See* W. Va.Code §§ 48-9-103(a-b). Identifying those other persons and/or entities who may intervene, the Legislature has specified that their intervention is appropriate in "exceptional cases". *See* W. Va.Code § 48-9-103(b). Absent a statutory definition of "exceptional cases," we must necessarily defer to the "common, ordinary and accepted meaning [of the terms] in the connection in which they are used." Syl. pt. 1, in part, *Miners in Gen. Group v. Hix,* 123 W.Va. 637, 17 S.E.2d 810. The word "exceptional" is defined as "[t]he rare—the unusual or extraordinary case or circumstance." Ballentine's Law Dictionary 426 (3d ed.1969) (citation omitted). *Accord* Chambers 20th Century Dictionary 438 (1983) (interpreting "exceptional" as "unusual"); Random House Webster's Unabridged Dictionary 674 (2d ed.1998) (stating that "exceptional" is "forming an exception or rare instance; unusual; extraordinary"); Webster's Ninth New Collegiate Dictionary 432 (9th ed.1983) (defining "exceptional" as "forming an exception: rare"). Stated otherwise, "exceptional" has been construed to mean "[o]f the nature of or forming an exception; out of the ordinary course, unusual, special." III The Oxford English Dictionary 374 (1969 re-issue). *Accord* Webster's Third New International Dictionary of the English Language Unabridged 791 (1970) (understanding "exceptional" as "forming an exception; *usu:* being out of the ordinary: uncommon, rare"). From these definitions of "exceptional," it is apparent that the Legislature intended to permit intervention in custodial proceedings only in unusual or extraordinary cases. Therefore, we hold that the reference to "exceptional cases" contained in W. Va.Code § 48-9-103(b) (2001) (Repl.Vol.2004) signifies unusual or extraordinary cases, and, accordingly, a court should exercise its discretion to permit intervention in such unusual or extraordinary cases only when intervention is likely to serve the best interests of the subject

child(ren).[10] We believe that the factual predicate of the case *sub judice* presents the unusual and extraordinary circumstances contemplated by the legislative intent of W. Va.Code § 48–9–103(b).

In this case, we are faced with the unique situation of a child who, since his birth, has lived in a nontraditional household and who has more than the customary number of parental figures in his young life. On the one hand are the biological parents of Z.B.S., Christina S., his now-deceased biological mother, and Clifford K., his biological father, who initiated the underlying custody action but who does not wish to assume custody of Z.B.S. On the other hand is Tina B., who has resided continuously with Z.B.S. since his birth and who has cared for and treated him as if he were her own biological child. As a result of the deep attachment and emotional bonds that have mutually arisen between Tina B. and Z.B.S., Tina B. characterizes herself as the child's psychological parent. Although we previously have recognized the concept of a psychological parent in our jurisprudence, we have never formally defined it. In order to ascertain whether Tina B. is Z.B.S.'s psychological parent and what effect, if any, such status would have upon her ability to intervene in these custodial proceedings, it is necessary first to gain a better understanding of the nature and scope of psychological parent status.

We first recognized the notion of a psychological parent in the case of *State ex rel. McCartney v. Nuzum*, 161 W.Va. 740, 248 S.E.2d 318 (1978), *overruled on other grounds by In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996). In that case, we recognized that "in certain instances psychological testimony would ... be relevant in aiding the determination of who should have custody of a child." 161 W.Va. at 744 n. 3, 248 S.E.2d at 320 n. 3 (citation omitted). However we declined to award custody to the psychological parent in that case because we previously had determined the child's natural mother to

be entitled to her custody. *See McCartney v. Coberly*, 250 S.E.2d 777 (W.Va.1978), *overruled on other grounds by Overfield v. Collins*, 199 W.Va. 27, 483 S.E.2d 27 (1996).

Our next consideration of psychological parent status was in *Honaker v. Burnside*, 182 W.Va. 448, 388 S.E.2d 322 (1989). *Honaker* involved a custodial contest between a child's natural father and her stepfather, with whom she had resided since she was just over one year old. In recognizing that a gradual transition of custody from the stepfather to the natural father was warranted, we observed with respect to the child's longtime residence with her stepfather and half-brother that "[t]hese familial surroundings are the only ones she has ever known, and it is undisputed that she has developed a close and loving relationship with her stepfather." 182 W.Va. at 450, 388 S.E.2d at 323. Thus, by recognizing the significant role her stepfather had played in the child's life as her psychological parent, we accorded visitation privileges to him, as well as to the child's half-brother, despite the ultimate award of the child's custody to her biological father.

The following year we again revisited the concept of a psychological parent in the case of *In re Brandon L.E.*, 183 W.Va. 113, 394 S.E.2d 515 (1990). In *Brandon*, we were called upon to ascertain which court possessed jurisdiction to decide the fate of a child embroiled in a bitter custody dispute between his biological father, with whom he had had infrequent contact, and his maternal grandmother, who had participated in his upbringing since his birth and who was, at the time of the proceedings, serving as his primary caretaker. During the course of our deliberations, we acknowledged that psychological parent status is entitled to consideration in appropriate cases:

If a child has resided with an individual other than a parent for a significant period of time such that the non-parent with whom the child resides serves as the child's psychological parent, during a peri-

---

**10.** At least one other court has similarly construed an "exceptional case" requirement in the context of child custody matters to warrant a case-by-case factual determination based upon the best interests of the child(ren) involved. *See In re Marriage of Williams*, 32 Kan.App.2d 842, 848, 90 P.3d 365, 370 (2004) ("Perhaps it is best that neither statutory law nor case precedent provides a definition for 'exceptional case.' The determination is too important to be subjected to a mechanical application of an artificial litmus test containing three factors or two prongs.").

od when the natural parent had the right to maintain continuing substantial contact with the child and failed to do so, the equitable rights of the child must be considered in connection with any decision that would alter the child's custody. To protect the equitable rights of a child in this situation, the child's environment should not be disturbed without a clear showing of significant benefit to him, notwithstanding the parent's assertion of a legal right to the child.

Syl. pt. 4, *In re Brandon*, 183 W.Va. 113, 394 S.E.2d 515.

Thereafter, in *Ortner v. Pritt*, 187 W.Va. 494, 419 S.E.2d 907 (1992) (per curiam), we considered who, as between the child's biological mother, with whom the child had resided only sporadically, and the child's paternal grandmother, with whom the child had lived for over half of his young life, was entitled to custody. We found the grandmother had become the child's psychological parent and awarded custody to her, instead of to the child's biological mother, because such a custodial placement was found to be in the child's best interests. We did not, however, expound upon the law of psychological parent status or further clarify that term.

In 1993, we decided *Simmons v. Comer*, 190 W.Va. 350, 438 S.E.2d 530 (1993). *Simmons* involved a concept that is remarkably similar to that of psychological parent status: the functioning father. Under the facts of that case, we determined that where a putative father has developed a strong relationship with a child and served as the child's functioning father, he may later have standing to seek custody of the child as against the child's a biological mother.

Where a biological mother is married to the putative father or, although not married, advises him that he is the biological father and he marries her, he may have standing through the doctrine of equitable estoppel to assert a right to custody of the child. In order to maintain his claim of custody, the putative father must demonstrate that he has developed a caring relationship to the child such that he has become a functioning father. He will also

have the benefit of the primary caretaker presumption if the facts so warrant.

Syl. pt. 5, *Simmons v. Comer*, 190 W.Va. 350, 438 S.E.2d 530. In order to attain such status, the putative father must demonstrate that he has a significant parental relationship with the child.·

A nonbiological father must show a caring father-child relationship, which means not only providing for the financial support of the child, but also emotional and psychological support. The relationship must have begun with the consent of the biological mother. It must not have been temporary and there must have been sufficient time for the nonbiological father to become the *functioning father*.

Syl. pt. 6, *Simmons*, 190 W.Va. 350, 438 S.E.2d 530. Defining the concept of "functioning father," we recognized that the duration of the relationship between the child and the functioning father "assists a court's determination as to the extent of the child's bond with the functioning father." *Id.*, 190 W.Va. at 359, 438 S.E.2d at 539 (citations omitted). An additional consideration is "'the need for consent to ensure that the existing legal parent has cooperated with or encouraged a man to assume a parenting role[.]'" *Id.*, 190 W.Va. at 359 n. 14, 438 S.E.2d at 539 n. 14 (quoting J.H. Anderson, *The Functioning Father: A Unified Approach to Paternity Determinations*, 30 J. Fam. L. 847, 865–67 (1992)).

We also stated in *Simmons* that "[w]e believe the principle of a functioning father is consistent with our previous cases and, particularly, *In Interest of Brandon L.E.*, 183 W.Va. 113, 394 S.E.2d 515 (1990), where we used the term 'psychological parent.'" 190 W.Va. at 360, 438 S.E.2d at 540 (footnote omitted). Recognizing this similarity, we further acknowledged that

"[a] psychological parent is one who, on a continuing, day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological needs for a parent, as well as the child's physical needs. The psychological parent may be a biological, ... adoptive, foster, or common-law ... parent, or any other person. There is no presumption in favor of

any of these after the initial assignment at birth[.]"

190 W.Va. at 360 n. 15, 438 S.E.2d at 540 n. 15 (quoting Joseph Goldstein et al., *Beyond the Best Interests of the Child* 98 (1979)). *Accord Overfield v. Collins,* 199 W.Va. 27, 37 n. 8, 483 S.E.2d 27, 37 n. 8 (1996).[11]

Most recently, in *In re Jonathan G.,* 198 W.Va. 716, 482 S.E.2d 893 (1996), we considered the role that foster parents may play in abuse and neglect proceedings in view of the significant relationship they have developed with the child for whom they have cared. We concluded that, as a result of the bonds that have formed, foster parents are, subject to the court's discretion, entitled to participate in such proceedings. In this regard, we held that "[t]he level and type of participation [by the foster parents] in such cases is left to the sound discretion of the circuit court with due consideration of the length of time the child has been cared for by the foster parents and the relationship that has developed[.]" Syl. pt. 1, in part, *id.* We ultimately concluded that, as a result of the strong emotional attachment the child had to the foster parents, who had served as his custodians from the time he was ten months old until he was over four years old, they were entitled to visitation with the child, provided such visitation was in the boy's best interests.

From our prior decisions, we can glean several common threads as to the meaning of psychological parent status, both from our specific recognition of this term and from our cases involving persons who have not been specifically denominated as psychological parents but who nevertheless have established such a meaningful relationship with · a minor child so as to be entitled to greater protection under the law than would ordinarily be afforded to one who is not the biological or adoptive parent of the child. Stitching together these common threads, we find that the most crucial components of the psychological parent concept are the formation of a significant relationship between a child and an adult,[12] who may be, but is not required to be, related to the child biologically or adoptively;[13] a substantial temporal duration of the relationship;[14] the adult's assumption of caretaking duties for and provision of emotional and financial support to the child;[15] and, most importantly, the fostering and encouragement of, and consent to, such relationship by the child's legal parent or guardian.[16] Moreover, our prior decisions suggest that one may attain psychological parent status either while living in the same household as the child and his/her legal par-

11. Although we acknowledged the existence of the psychological parent concept in *Overfield v. Collins,* 199 W.Va. 27, 483 S.E.2d 27 (1996), further discussion of the facts and law of that case is not instructive to our present analysis. In summary, *Overfield* involved the transfer of custody from a biological mother to the children's maternal grandparents, and our law of the case sought to clarify the procedures to be followed when such a custodial transfer occurs. Insofar as Christina S. did not transfer custody of Z.B.S. to any party before her death, the holdings of *Overfield* are inapplicable to the case *sub judice.* *See generally* Syl. pts. 1–6, *Overfield,* 199 W.Va. 27, 483 S.E.2d 27.

12. *See, e.g.,* Syl. pt. 1, in part, *In re Jonathan G.,* 198 W.Va. 716, 482 S.E.2d 893 (1996); *Overfield v. Collins,* 199 W.Va. 27, 37 n. 8, 483 S.E.2d 27, 37 n. 8 (1996); Syl. pts. 5–6, in part, *Simmons v. Comer,* 190 W.Va. 350, 438 S.E.2d 530 (1993); *Ortner v. Pritt,* 187 W.Va. 494, 419 S.E.2d 907 (1992) (per curiam); *In re Brandon L.E.,* 183 W.Va. 113, 394 S.E.2d 515 (1990); *Honaker v. Burnside,* 182 W.Va. 448, 450, 388 S.E.2d 322, 323 (1989).

13. *See, e.g.,* Syl. pt. 1, in part, *In re Jonathan,* 198 W.Va. 716, 482 S.E.2d 893; *Overfield v. Collins,* 199 W.Va. at 37 n. 8, 483 S.E.2d at 37 n. 8; Syl. pts. 5–6, in part, *Simmons v. Comer,* 190 W.Va. 350, 438 S.E.2d 530; *Ortner v. Pritt,* 187 W.Va. 494, 419 S.E.2d 907; *In re Brandon,* 183 W.Va. 113, 394 S.E.2d 515; *Honaker v. Burnside,* 182 W.Va. at 450, 388 S.E.2d at 323.

14. *See, e.g.,* Syl. pt. 1, in part, *In re Jonathan,* 198 W.Va. 716, 482 S.E.2d 893; *Overfield v. Collins,* 199 W.Va. at 37 n. 8, 483 S.E.2d at 37 n. 8; Syl. pt. 6, in part, *Simmons v. Comer,* 190 W.Va. 350, 438 S.E.2d 530; *Ortner v. Pritt,* 187 W.Va. 494, 419 S.E.2d 907; Syl. pt. 4, in part, *In re Brandon,* 183 W.Va. 113, 394 S.E.2d 515; *Honaker v. Burnside,* 182 W.Va. at 450, 388 S.E.2d at 323.

15. *See, e.g.,* *Overfield v. Collins,* 199 W.Va. at 37 n. 8, 483 S.E.2d at 37 n. 8; Syl. pts. 5–6, *Simmons v. Comer,* 190 W.Va. 350, 438 S.E.2d 530; *Ortner v. Pritt,* 187 W.Va. 494, 419 S.E.2d 907; *In re Brandon,* 183 W.Va. 113, 394 S.E.2d 515.

16. *See, e.g.,* Syl. pts. 5–6, in part, *Simmons v. Comer,* 190 W.Va. 350, 438 S.E.2d 530.

ent or guardian [17] or while residing with the child in the absence of the child's legal parent or guardian.[18] Accordingly, we hold that a psychological parent is a person who, on a continuing day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills a child's psychological and physical needs for a parent and provides for the child's emotional and financial support. The psychological parent may be a biological, adoptive, or foster parent, or any other person. The resulting relationship between the psychological parent and the child must be of substantial, not temporary, duration and must have begun with the consent and encouragement of the child's legal parent or guardian. To the extent that this holding is inconsistent with our prior decision of *In re Brandon L.E.*, 183 W.Va. 113, 394 S.E.2d 515 (1990), that case is expressly modified.[19]

 With the announcement of this holding we also wish to make it abundantly clear that the mere existence of a psychological parent relationship, in and of itself, does not automatically permit the psychological parent to intervene in a proceeding to determine a child's custody pursuant to W. Va. Code § 48–9–103(b). Nothing is more sacred or scrupulously safeguarded as a parent's right to the custody of his/her child.

In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.

Syl. pt. 1, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973). *Accord* Syl., *Whiteman v.*

*Robinson*, 145 W.Va. 685, 116 S.E.2d 691 (1960) ("A parent has the natural right to the custody of his or her infant child, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment or other dereliction of duty, or has waived such right, or by agreement or otherwise has transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts."). *See also Honaker*, 182 W.Va. at 452, 388 S.E.2d at 325 (stating that "[a]lthough we recognize the attachment and secure relationship" between the child and her psychological parent stepfather, "such bond cannot alter the otherwise secure natural rights of a parent," namely the child's biological father). *But see* Syl. pt. 6, in part, *Lemley v. Barr*, 176 W.Va. 378, 343 S.E.2d 101 (1986) ("The law does not recognize any absolute right in any person or claimant to the custody of a child."); Syl. pt. 3, in part, *State ex rel. Lipscomb v. Joplin*, 131 W.Va. 302, 47 S.E.2d 221 (1948) ("[T]he court is in no case bound to deliver the child into the custody of any claimant and may permit it to remain in such custody as its welfare at the time appears to require."). For this reason, the limited rights of a psychological parent cannot ordinarily trump those of a biological or adoptive parent to the care, control, and custody of his/her child. Nonetheless, as we have alluded to throughout the course of this opinion, the case we presently have before us does not comport with the usual facts attending a custodial determination under W. Va.Code § 48–9–101, *et seq.* Consequently, we hold that, in exceptional cases and subject to the court's discretion, a psychological parent may intervene in a custody proceeding brought pursuant to W. Va.Code § 48–9–103 (2001) (Repl.Vol.2004) when such intervention is

---

**17.** *See, e.g.,* Syl. pt. 5, in part, *Simmons v. Comer*, 190 W.Va. 350, 438 S.E.2d 530; *Honaker v. Burnside*, 182 W.Va. at 450, 388 S.E.2d at 323.

**18.** *See, e.g.,* Syl. pt. 1, in part, *In re Jonathan*, 198 W.Va. 716, 482 S.E.2d 893; *Ortner v. Pritt*, 187 W.Va. 494, 419 S.E.2d 907; *In re Brandon*, 183 W.Va. 113, 394 S.E.2d 515.

**19.** This holding is in line with other courts that have defined "psychological parent" or discussed the similar concepts of "de facto parent" status or "in loco parentis". *See, e.g., V.C. v. M.J.B.,*

319 N.J.Super. 103, 725 A.2d 13 (1999), *aff'd,* 163 N.J. 200, 748 A.2d 539 (2000); *T.B. v. L.R.M.,* 2000 Pa.Super. 168, 753 A.2d 873, *appeal granted,* 568 Pa. 667, 795 A.2d 979 (2000) (unpublished table decision), *aff'd,* 567 Pa. 222, 786 A.2d 913 (2001); *In re Parentage of L.B.,* 121 Wash.App. 460, 89 P.3d 271, *review granted,* 152 Wash.2d 1013, 101 P.3d 107 (2004) (unpublished table decision). *But see B.F. v. T.D.,* No.2004–CA–000083–ME, 2005 WL 857093 (Ky.Ct.App. Apr.15, 2005).

likely to serve the best interests of the child(ren) whose custody is under adjudication.[20]

Applying these principles to the case *sub judice,* we first must determine whether Tina B. is Z.B.S.'s psychological parent. Without a doubt, she is. From the moment of his birth, Tina B. resided in Christina S.'s household with Z.B.S. and parented him as if he were her own biological child. Although Christina S. was the child's primary caretaker, Tina B. nevertheless also attended to his needs and provided financial as well as emotional support for the child. In fact, the circuit court, adopting the findings of the family court, specifically so found:

The evidence shows that Tina B[.] and Christina S[.] planned the birth of Z.B.S. and enlisted the involvement of Clifford K[.] only for the purpose of impregnating Christina S[.] It was their apparent intention together to raise Z.B.S. ... as a "family" unit .... *[A] strong parent-child bond exists between Z.B.S. and Tina B[.]*

Apparently no relationship existed between Clifford K[.] and Christina S[.] before conception of Z.B.S. Although he has had contact with Z.B.S. since the child's birth, he has performed limited care-giving functions and his planned as well as actual involvement with the child has been limited. Clifford K[.] would not have sought primary custody of Z.B.S. but for the death of Christina D. S[.] in June 2002. *The bond between Clifford K[.] and Z.B.S. is not as strong as the bond between Z.B.S. and Tina B[.]*

....

Prior to the death of Christina S[.] on June 1, 2002, Christina S[.] was the primary custodian and caretaker of Z.B.S. and *of the parties to this matter, Tina B[.] provided the most caretaking services to Z.B.S. prior to June 1, 2002.*

(Emphasis added). The circuit court also noted that "the child resided with the biological mother and [Tina] B[.] from birth until the biological mother's untimely death, when

the child was approximately two and a half years old."

These findings are further supported by the recommendations of the child's guardian ad litem, who similarly observed that

as an intended consequence of their intimate relationship, Tina and Chris [Christina S.] enlisted the assistance of the Petitioner Clifford K[.] (hereafter "Cliff") to impregnate Chris, so that Tina and Chris could have a child "together." ...

In April, 1999, Chris's pregnancy was confirmed....

From April, 1999 until December, 1999, Tina accompanied Chris to almost all prenatal medical appointments. Z[.B.S.] was born on December 25, 1999.... Tina, Chris, and Z[.B.S.] ... continued to reside together in Clay County as a family unit.

... Tina kept Z[.B.S.] the vast majority of the time after his first year of life while Chris was at work....

... [A] significant bond and affection exists between Tina and Z[.B.S.] ...

....

But for Chris' tragic death in June of 2002, ... Chris and Tina would have continued to raise Z[.B.S.] as they had from his birth on December 25, 1999 until June 1, 2002....

... [Tina B.] has been Z.[B.S.]'s psychological parent since the date of his birth on December 25, 1999. She, along with Chris (until her death), has lived with Z[.B.S.] since his birth and she has performed all of the traditional caretaking functions of a parent as well as having financially supported him during his life. And the fact that she served as Z[.B.S.]'s parent was not by accident. Rather, it was by design, and by the agreement of Chris, Cliff, and Tina.

... Z[.B.S.] has clearly resided with Tina for a significant period of time such that Tina (by design and in practice) served as Z[.B.S.]'s psychological parent ....

**20.** This decision accords with our sister jurisdictions who have permitted a psychological parent to participate in custody proceedings. *See, e.g.,*

*T.B. v. L.R.M.,* 2000 Pa.Super. 168, 753 A.2d 873; *In re Parentage of L.B.,* 121 Wash.App. 460, 89 P.3d 271.

... Tina was and is Z.[B.S.]'s second mother, by design and in actuality. ...

Thus, there unquestionably exists a relationship of significant duration between Tina B. and Z.B.S. in which Tina B. has provided for the physical, psychological, financial, and emotional needs of Z.B.S. and such that the child regards Tina B. as a parental figure in his life.

Moreover, Christina S. not only consented to the formation of this strong relationship between Tina B. and Z.B.S.; Christina S. actively fostered and nurtured this bond. In the same manner, Clifford K. also acquiesced in the development of secure ties between Z.B.S. and Tina B., and, like Christina S., purposefully encouraged such a familial relationship. Having satisfied the above-enumerated criteria, we are convinced that Tina B. is the psychological parent of Z.B.S.

Having established Tina B.'s relationship to the subject child, we next must determine whether her status as a psychological parent entitles her to intervene in proceedings seeking a determination of his custody. Under the unique facts and circumstances of this case, we agree with the family court's conclusion that Tina B. is a proper party to these proceedings and disagree with the contrary decision reached by the circuit court. Although we caution that not every psychological parent is, by virtue of such status, entitled to intervene in custodial proceedings pursuant to W. Va.Code § 48–9–103(b), the very unusual and extraordinary facts of this case warrant extending that privilege to Tina B. Not only do the facts support such a finding herein, but the best interests of the subject child demand such a result. The best interests of Z.B.S. also militate in favor of an award of custody to Tina B., consistent with the result obtained by the Family Court of Clay County.

■■■■■ At the forefront of our decision is the counsel of the Legislature that the aim of the governing statute is to secure the best interests of the children whose custody is to be determined and to promote stability and certainty in their young lives. "The primary objective of this article is to serve the child's best interests, by facilitating ... [s]tability of the child ... [and] ... [c]ontinuity of exist-

ing parent-child attachments[.]" W. Va.Code §§ 48–9–102(a)(1,3). This appreciation for stability in a child's life has also been a frequent refrain of this Court. "[S]tability in a child's life is a major concern when formulating custody arrangements." *Snyder v. Scheerer,* 190 W.Va. 64, 72–73, 436 S.E.2d 299, 307–08 (1993) (per curiam) (citation omitted). Therefore, "in cases where a child has been in one home for a substantial period, '[h]is environment and sense of security should not be disturbed without a clear showing of significant benefit to him.'" *In re Brandon,* 183 W.Va. at 121, 394 S.E.2d at 523 (quoting *Lemley v. Barr,* 176 W.Va. 378, 386, 343 S.E.2d 101, 110 (1986) (internal quotations and citations omitted)). We would be remiss if we did not also reiterate that "[a] child has rights, too, some of which are of a constitutional magnitude." *Lemley,* 176 W.Va. at 386, 343 S.E.2d at 109 (internal quotations and citations omitted). Among these, "[a] child has a right to continued association with individuals with whom he has formed a close emotional bond ... provided that a determination is made that such continued contact is in the best interests of the child." Syl. pt. 11, in part, *In re Jonathan,* 198 W.Va. 716, 482 S.E.2d 893. *Accord Snyder v. Scheerer,* 190 W.Va. at 72, 436 S.E.2d at 307 (recognizing "the right of a child to continued association with those individuals to whom the child has formed an attachment"). In this regard, "[t]he length of time that the child has remained with [such individual(s)] is a significant factor to consider in determining this issue." *In re Jonathan,* 198 W.Va. at 736 n. 41, 482 S.E.2d at 913 n. 41.

■■■■■ The tragic events that have led to the circumstances in which Z.B.S. currently finds himself have resulted in litigation over his permanent custodial placement only because too many people love this little boy. Oh that all of the children whose fates we must decide would be so fortunate as to be too loved. That said, it is now up to this Court to ascertain whether the family court correctly determined that Z.B.S.'s best interests would be served by awarding his custody to Tina B. First and foremost, we have determined that Tina B. is Z.B.S.'s psycho-

logical parent, with all the bonds, attachments, caretaking functions, and responsibilities that such status entails. In reaching this decision, we have found that both of the child's biological parents not only acquiesced in, but actively fostered, the relationship that has developed between Tina B. and Z.B.S.

We also are persuaded by the current situation into which the child has been thrust upon the tragic death of his mother: the other parental figure with whom he has continuously resided, Tina B., is eager to legally assume his custody and to continue attending to his daily needs, and his biological father, his sole surviving legal parent, readily agrees and enthusiastically consents to such an arrangement. To reunite Tina B. and Z.B.S. through a formal custodial arrangement would be to secure the familial environment to which the child has become accustomed and to accord parental status to the adult he already views in this capacity. Simply stated, an award of custody to Tina B., having found no indication that she is unfit[21] to serve as the minor's custodian, would promote Z.B.S.'s best interests by allowing continuity of care by the person whom he currently regards as his parent and would thus provide stability and certainty in his life.[22] *See* Syl. pt. 11, *In re Jonathan*, 198 W.Va. 716, 482 S.E.2d 893; *In re Brandon*, 183 W.Va. at 121, 394 S.E.2d at 523; *Lemley v. Barr*, 176 W.Va. at 386, 343 S.E.2d at 110.[23]

While we applaud the efforts of the maternal grandparents of Z.B.S. to secure his guardianship upon his mother's death to ensure that his care, custody, and control would not be left to chance, their rights to and relationship with Z.B.S., while significant and substantial, simply are not on par with those of Tina B. under the facts and circumstances of this case. *Cf. Rozas v. Rozas*, 176 W.Va.

235, 238, 342 S.E.2d 201, 205 (1986) ("Absent a showing that a natural parent is unfit, a natural parent's right to custody outstrips that of a grandparent." (citations omitted)); *Leach v. Bright*, 165 W.Va. 636, 638, 270 S.E.2d 793, 794 (1980) (per curiam) ("The law in this jurisdiction has long been that the fit natural parent's right to custody of his or her child is paramount to that of any third party, including a grandparent." (citation omitted)). *See also* Syl. pt. 3, *State ex rel. David Allen B. v. Sommerville*, 194 W.Va. 86, 459 S.E.2d 363 (1995) (holding that, with regard to establishment of paternity, rights of grandparent are more limited than those of alleged biological parent); *Frame v. Wehn*, 120 W.Va. 208, 212, 197 S.E. 524, 526 (1938) (finding that rights of grandparents were not coextensive with those of parents in guardianship proceedings).

For these reasons, then, we find that Tina B. was entitled to participate in Z.B.S.'s custodial proceedings. Accordingly, we reverse the December 2, 2003, ruling of the Clay County Circuit Court which denied Tina B. permission to participate in Z.B.S.'s custodial determination. Furthermore, remanding this case for additional proceedings to determine Z.B.S.'s permanent custody would be futile. The family court has consistently held that the best interests of Z.B.S. dictate that his custody be awarded to Tina B., which finding is consistent with the guardian ad litem's recommendations and the psychological evidence presented below. Moreover, the circuit court has adopted these findings of fact in rendering its decision in this matter which differs from the conclusions of the family court solely on the basis of the application of the law to the facts of this case. From our consideration of this matter, we

---

**21.** In fact, the guardian ad litem specifically addressed this point and stated that "no party [has] raised any parental fitness issue regarding Tina's shared upbringing of Z[.B.S.]"

**22.** We emphasize, though, that if Clifford K. had substantially participated in Z.B.S.'s upbringing, expressed an interest in obtaining custody of his biological son, and actively participated in the instant proceedings, barring a finding that Clifford K. is unfit, a different result might have been reached as to the custodial placement most befitting the best interests of Z.B.S.

**23.** For decisions of other courts who have considered cases involving facts similar to those presented by the case *sub judice* see generally Robin Cheryl Miller, *Child Custody and Visitation Rights Arising from Same–Sex Relationship*, 80 A.L.R.5th 1 (2000). *See also* Nancy G. Maxwell & Caroline J. Forder, *The Inadequacies in U.S. and Dutch Adoption Law to Establish Same–Sex Couples as Legal Parents: A Call for Recognizing Intentional Parenthood*, 38 Fam. L.Q. 623 (2004).

agree with the family court's assessment of the evidence and the circuit court's adoption of those findings. Simply stated, the child's best interests would best be served by awarding permanent custody of Z.B.S. to Tina B. Thus, we reinstate the July 25, 2003, decision of the Clay County Family Court awarding custody of the minor child Z.B.S. to Tina B.[24]

In closing, we wish to restate a cautionary admonition we first intimated in *Honaker v. Burnside*, 182 W.Va. 448, 388 S.E.2d 322 (1989), and later reiterated in *Overfield v. Collins*, 199 W.Va. 27, 483 S.E.2d 27 (1996):

> "The work that lies ahead for both [adults] is not without inconvenience and sacrifice on both sides. Their energies should not be directed even partially at any continued rancor at one another, but must be fully directed at developing compassion and understanding for one another, as well as showing love and sensitivity to the child[']s feelings at a difficult time in all their lives."

*Overfield*, 199 W.Va. at 38, 483 S.E.2d at 38 (quoting *Honaker*, 182 W.Va. at 453, 388 S.E.2d at 326–27). This same wise counsel applies with equal force to the parties in this case, Tina B. and Paul S. We only hope that they and their respective families can let bygones be bygones and now interact amicably for the sake of Z.B.S.

## IV.

### CONCLUSION

For the foregoing reasons, the December 2, 2003, decision of the Circuit Court of Clay County is hereby reversed.

Reversed.

Justice STARCHER concurs and reserves the right to file a concurring opinion.

Justice BENJAMIN concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.

Justice MAYNARD dissents and reserves the right to file a dissenting opinion.

MAYNARD, Justice, dissenting:

(Filed July 11, 2005)

I am dismayed that this Court has written an opinion that is so anti-family. The majority's decision in this case places a child in a single-parent home with a person who is not a biological relative even though a two-parent home consisting of the child's biological relatives—his grandparents—is available. I am simply at a loss to understand the majority's reasoning, and therefore, I dissent.

Contrary to the majority, I do not believe that Tina B. had standing to seek custody of Z.B.S. pursuant to W.Va.Code § 48–9–103 (2001). The majority's decision in this case to afford Tina B. "psychological parent" status and allow her to gain custody of Z.B.S. is yet another example of this Court's willingness to make law in areas reserved to the Legislature. Although this Court has previously acknowledged that it "does not sit as a superlegislature" and that it is the duty of the Legislature, not this Court, to "consider facts, establish policy, and embody that policy in legislation," *Boyd v. Merritt*, 177 W.Va. 472, 474, 354 S.E.2d 106, 108 (1986), the majority does so in this case under the guise of doing what is in the best interests of Z.B.S. Unfortunately, to me at least, it is not clearly in the best interests of Z.B.S. to be placed in the custody of Tina B.

What is clear to me is that it is the province of the Legislature, *not this Court*, to extend custodial rights to the same sex partner of a biological parent. In that regard, virtually all of our law with respect to family matters is statutory in nature. Since divorce and custody are purely statutory and the common law is not implicated, this Court must look to the Legislature to make or change family law. It is improper for this Court to make new law in this area. While the Legislature recodified our family law statutes in 2001, it did not address the right of same sex partners of biological parents to seek custody and visitation upon the dissolution of their relationships through death or separation. The majority, however, has done so with this case by construing language in

24. Having resolved the case in this fashion, we need not address Tina B.'s remaining assignments of error.

W.Va.Code § 48–9–103(b) allowing intervention "by other persons or public agencies" in "exceptional cases" in such a manner as to create a substantive right where none existed before. The majority has effectively broadened the three categories of persons who have standing to participate in custodial determinations pursuant to W.Va.Code § 48–9–103(a) to include a fourth entirely new category it calls "psychological parents." I do not believe that this judge-made category was contemplated when the Legislature enacted subsection (b) of W.Va.Code § 48–9–103 to deal with "exceptional cases."

I am afraid that the majority has headed down a slippery slope with its decision in this case. I say this because I think that the following scenario is likely to be presented to courts all over West Virginia. Bob and Jane get married, have a child, and soon after, they divorce. Jane and the child then begin living with Freddy, but Jane does not marry Freddy. After Jane and her child have lived with Freddy for three or fours years, Jane dies. Can Freddy then claim that he is the "psychological parent" of the child with standing to litigate and oppose biological father Bob's right to custody? I believe the majority's decision in this case creates that right for Freddy. Furthermore, it may also allow Freddy to sue Jane for custody of the child if they merely separate and she and the child move out. If Freddy could sue one biological parent for custody, why not the other? After all, if Tina B. is a psychological parent, then Freddy is also a psychological parent, and there is nothing to prevent him from having standing to sue Jane for custody. Pursuant to the majority's decision, Freddy clearly has standing, that is unless the majority intended this case to give standing only to same-sex partners of biological parents. However, the majority did not say such was the case so it must also apply to and give standing to heterosexual partners as well.

I certainly sympathize with the parties in this case. They suffered a tragic loss and each is attempting to fulfill what they believe were Christina S.'s wishes for Z.B.S. I also recognize that this Court has always resolved custody disputes by considering first and foremost the best interests of the child. *See, e.g., Michael K.T. v. Tina L.T.*, 182 W.Va. 399, 405, 387 S.E.2d 866, 872 (1989) ("[T]he best interests of the child is the polar star by which decisions must be made which affect children."). That is the precedent of this Court, it should be followed, and it is the right thing to do. However, in order to achieve what it believes is in the best interests of Z.B.S., the majority has resorted to legislating a new class of persons who will now have standing to take part in custodial disputes even though they have no biological or other statutorily recognized right to do so. Although families in our society today have taken on new forms, many have not yet been recognized by our Legislature. In my opinion, this Court should not impose its judgment where the Legislature has not spoken.

Surprisingly, the majority has actually chosen to ignore the guidance the Legislature has provided on this issue. In that regard, W.Va.Code § 49–3–1(a) (2001) provides for grandparent preference in determining adoptive placement for a child where parental rights have been terminated. While this is not an abuse and neglect case, I believe that the public policy set forth in this statute—to place children who cannot live with a natural parent in the custody of a grandparent where possible—should have been considered here. Obviously, this preference for grandparent custody is derived from the natural right to custody of a biological parent. *See* Syllabus Point 1, *Leach v. Bright*, 165 W.Va. 636, 270 S.E.2d 793 (1980) ("A parent has the natural right to the custody of his or her infant child and, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment, or other dereliction of duty, or has waived such right, or by agreement or otherwise has permanently transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her child will be recognized and enforced by the courts."). In my opinion, the majority's decision to create a new class of "psychological parents" to resolve the custody issue in this case was simply unwarranted given the public policy expressed in W.Va.Code § 49–1–3(a).

In this case, there was no evidence presented indicating that placing Z.B.S. in the custody of his maternal grandparents would not be in his best interests. To the contrary, the record reflects that Z.B.S. has spent a considerable amount of time with his maternal grandparents and that a strong child-grandparent bond exists. Given these circumstances, I can see no reason why Z.B.S. could not have a happy and healthy childhood in their care.

While Z.B.S's relationship with Tina B. should be respected and allowed to continue, I do not believe there was any statutory basis for this Court to place him in her custody. Like the circuit court below, I believe that the question of whether to extend the concept of "psychological parent" to reach these circumstances is a question better left to the Legislature in its capacity as a voice of the people of the State of West Virginia. Accordingly, I respectfully dissent to the majority's decision in this case.

STARCHER, J., concurring:

(Filed July 14, 2005)

I write separately to applaud the actions of the family court judge in this case. While bad facts often make bad law, in this case the family court judge followed the polar star of any child custody case and determined that it was in Z.B.S.'s best interest that Tina B. have custody.

The dissenting opinion of Justice Maynard suggests that because Z.B.S. shares some percentage of genetic material with Paul S., then Paul S. is legally entitled to his care, custody, and any income which might result from Z.B.S.'s lawsuit arising from the death of his mother or his social security benefits. This dissent casts the majority's decision to support the family court judge as "anti-family." Nothing could be further from the truth.

A family is a collection of people composed of parents and children.[1] But not all families are composed of parents and children who are related by blood. Many families have

stepparents, stepchildren, foster children, adopted children, or are composed of guardians and wards. We would never go so far as to say these latter compilations founded on love are not "families," and, more importantly, we should never say that mere blood relations should trump a relationship based upon love and trust.

In this case, Tina B. was a "mother" to Z.B.S. Tina B. shared in the decision to bring Z.B.S. into this world, helped plan the birthing of Z.B.S., helped create a nursery in which to care for Z.B.S. upon his arrival, and also "mothered" Z.B.S. from birth until the death of his biological mother, Christina S.

Time and again cases come before courts where an adult has voluntarily taken on the responsibility for raising a child to whom they are not related in any fashion. After a period, the child and adult usually form a parent-child psychological bond. A court cannot and would not allow a stranger to the child to intervene and take that child away from a biological parent who had raised the child, and by the same reasoning, should not allow a stranger to the child—even if genetically related—to take the child away from a psychological parent.

I therefore concur with the majority opinion.

BENJAMIN, Justice, concurring, in part, and dissenting, in part:

(Filed Aug. 8, 2005)

Ours is a consideration of rights, not politics; of law, not agendas. The determination of Z.B.S.'s best interests, being the touchstone in this case, must derive from the law of this State and not from generalized preconceptions, or misconceptions, interjected by the parties or by groups with outside partisan agendas to foster. Justice requires that we, as a court, apply this law to the actual findings specific to this case. Justice likewise demands that we decline the invitation from some to pander to derisive prejudices and from others to engage in social engineering from behind the closed doors of our chambers. Fundamental to the justice

1. Pope Pius XI called family the "first and essential cell of human society." Ogden Nash, however, defined a family as "a unit composed not only of children, but of men, women, an occasional animal, and the common cold."

we do must be our adherence to the principle that individuals be judged on who, not what, they are. We do justice for Z.B.S. when we apply the law, clear as it is here, equally and dispassionately. We do justice to the people of West Virginia when we go no further.

The facts of this case are as compelling as they are tragic. What is clear in this case is that Z.B.S. does not need to become the latest means to a political end; a forgotten footnote in the annals of competing national political agendas.[1] I concur with the majority that Tina B. does not meet the requirements for standing under W. Va.Code § 48–9–103(a). I likewise agree that standing for Tina B. is dependent on her ability to meet the specific requirements of W. Va.Code § 48–9–103(b). I dissent from the majority's resurrection and expansion of the legal fiction called "psychological parent" which is unnecessary and, I believe, ill-advised.[2] I likewise dissent from the majority's decision to, on appellate review, rule with finality on the standing and the custody issue. W. Va.

Code § 48–9–103(b), by its express terms, leaves both determinations to the sound discretion of the Family Court. The orders below reveal both the Family Court and the Circuit Court to have considered standing only under the provisions of W. Va.Code § 48–9–103(a). We do not therefore have before us for our review a consideration of standing under the remainder of W. Va.Code § 48–9–103. The resolution of this custody matter must rest with the judgment of the Family Court. The Family Court has the opportunity to factually hear testimony, observe witnesses and their demeanor, evaluate fitness of the parties, and consider the child's needs better than can we on appeal. This case should therefore be remanded to the Family Court for consideration of Tina B.'s standing under W. Va.Code § 48–9–103(b).

1. I applaud the majority's admirable rejection of the parties' and amici's invitation to politicize the Court's determination of this child's best interests.

2. Prior to legislative changes regarding child custody in West Virginia enacted between 1999 and 2001, the "psychological parent" concept created by this Court was at best one of limited duration, restricted application and questionable provenance. The concept was created to recognize that, where a legal parent was no longer an emotional part of a child's life, another person might become a de facto parent for custody purposes. The concept was used only in custody disputes where a child had lived for extended periods with non-parents, was never used where a legal parent had custody, and was always limited to relatives by blood or marriage to the child. Ironically, the "psychological parent" concept was most often used for grandparents seeking custody. In such situations, the Court considered the equitable interests of the child where the welfare of the child and the natural rights of the legal parent were in conflict. Under no reading of the "psychological parent" concept heretofore used by this Court could Tina B. have qualified as a "psychological parent" because at all times when she could have been considered for such a concept, Z.B.S. was always with his natural mother, Christina S.

With the 1999 legislative session, West Virginia began a total reformation of its child custody law. Between 1999 and 2001, the Legislature supplanted the former law, much of it common-law. For example, the new legislative changes

favored a shared parenting arrangement where possible, rather than the former primary caretaker presumption. See W. Va.Code §§ 48–11–101 to 48–11–603 (1999) (amended and recodified at W. Va.Code §§ 48–9–101 to 48–9–604 (2003)). The current law is comprehensive and necessarily bears upon the precedential value of this Court's prior holdings. That includes this Court's experiment with the "psychological parent" concept. Exercising its prerogative, the Legislature has set forth the statutory standards by which custody in this matter should be determined. I believe that the Legislature has ably considered the competing considerations of parental rights, child interests, and the limitations of state intervention into family life to mold a practical, workable statutory formula for consideration of custody which establishes West Virginia's public policy on custody determinations. To the extent that there remained any viability of the "psychological parent" concept at the time of the comprehensive legislative changes of 1999 to 2001, I believe it to have been codified by the Legislature in W. Va.Code § 48–9–103(b). To the extent that legal fictions creating de facto relationships should be created, the Legislature has shown that it will do so when it desires to do so. See W. Va.Code § 48–5–707 (2001) (governing "reduction or termination of spousal support because of de facto marriage)." Recently, we acknowledged the problems attendant to the creation by the courts of legal relationships based on de facto labels when we rejected the invitation to create a psychological "foster child" relationship in Glen Falls Insurance Co. v. Smith, 217 W.Va. 213, 617 S.E.2d 760 (2005).